## SPOFFORD *v*. KIRK.

A. employed B. to collect a claim against the United States. Before its allowance, or the issue of a warrant for its payment, he drew, in favor of C., an order on B., payable out of any moneys coming into his hands on account of said claim. B. accepted it, and D. became the holder of it in good faith and for value. A. refused to recognize its validity after the warrant in his favor had been issued, or to indorse the latter. D. thereupon filed his bill against A. and B. to enforce payment of the order. *Held*, 1. That the order became, upon its acceptance, and in the absence of any statutory prohibition, an equitable assignment *pro tanto* of the claim. 2. That, under the act of Feb. 26, 1863 (10 Stat. 170, re-enacted in sect. 3477, Rev. Stat.), the accepted order was void, and that D. took no interest in the claim, and acquired no lien upon the fund arising therefrom.

APPEAL from the Supreme Court of the District of Columbia.

James B. Kirk employed Hosmer & Co. to prosecute his claim for $12,000 against the United States, for supplies furnished to the army during the war of the rebellion, and for damages sustained by reason of the military occupation of his property. Before the allowance of the claim, he drew upon that firm the following orders: —

> "CULPEPER COURT-HOUSE, VA.,
> "Jan. 14, 1873.

"Messrs. Hosmer & Co., of Washington City, D. C., will please pay to J. S. Wharton, or order, six hundred ($600) dollars out of whatever moneys may be coming into your hands for me, for supplies furnished and damages sustained by the United States army during the war.

> "JAMES B. KIRK."

> "CULPEPER COURT-HOUSE, VA.,
> "Jan. 14, 1873.

"Messrs. Hosmer & Co., of Washington City, D. C., will please pay to E. R. Taylor, or order, six hundred ($600) dollars out of whatever moneys may be coming into your hands for me, for supplies furnished and damages sustained by the United States army during the war.

> "JAMES B. KIRK."

Which were thereupon severally accepted by the drawees, by writing across the face of the first, as follows: —

"WASHINGTON, Jan. 24, 1873.

"Accepted: payment to be made out of any moneys received by us from the United States on the claim of said James B. Kirk, and remaining in our hands, after deduction and payment of attorney's fees in the case.

"HOSMER & Co."

And of the second, as follows:—

"Accepted: payment to be made out of any moneys received by us from the United States on the claim of said James B. Kirk, and remaining after deduction and payment of our attorney's fees in the case, and also our acceptance of a similar order for the same amount in favor of Dr. J. S. Wharton.

"HOSMER & Co.

"Jan. 25, 1873."

The orders bearing said acceptances, and indorsed by the respective payees, were, in February, 1873, offered for sale to Ainsworth R. Spofford, who, on the written assurance of the drawees that Kirk had been allowed by the government something over $9,000, became the assignee or holder of both for value and in entire good faith.

Upon the issue of the treasury warrant for the sum awarded to Kirk, Spofford made demand upon Hosmer & Co. for the payment of the orders. Kirk having refused to indorse the warrant or to admit the validity of the orders, Spofford filed this bill to enforce compliance with said orders and acceptances, and to enjoin Hosmer & Co. from surrendering and Kirk from receiving said warrant.

The court below dismissed the bill, whereupon Spofford appealed here.

*Mr. T. A. Lambert* for the appellant.

As the orders furnish no evidence of a purpose on the part of Kirk to assign his claim against the United States, they were not drawn in derogation of the act of Feb. 26, 1853, and are not affected by it.

They were designed to clothe the respective payees with the badge of absolute ownership of the amount thereby severally appropriated to them or their assigns, "out of whatever moneys might be coming into the hands of the drawees for the drawer,

for supplies furnished and damages sustained by the United States army during the war." The fund thus designated had but a potential existence, and was wholly unaffected by the orders, until it actually or constructively reached the hands of the drawees. From the moment, however, it came to their possession, they, by reason of their previous acceptance, became clothed with a trust to administer it agreeably to the directions contained in the orders. In other words, the orders, when drawn and accepted, created in equity an absolute and irrevocable appropriation of their contents when collected by the drawees from the drawer's claim against the government, and the sums named were held by Hosmer & Co. in trust for the payees or their assignees. Story, Eq. Jur., sects. 1040–1047; *Mandeville* v. *Welch*, 5 Wheat. 277; *Tiernan et al.* v. *Jackson*, 5 Pet. 580; *Croser* v. *Craig*, 1 Wash. 424; *Mnemony et al., Assignees,* v. *Ferrers*, 3 Johns. (N. Y.) 71; *Weston* v. *Barker*, 12 id. 276; *Morton* v. *Nailor*, 1 Hill (N. Y.), 585; *Burn* v. *Carvalho*, 4 Myl. & Cr. 702, 703; *Row* v. *Dawson*, 1 Ves. 331; *L'Estrange* v. *L'Estrange*, 13 Beav. 284; 2 Spence, Eq. Jur. 855, 860, 861, 907.

The accepted orders constitute a contract which a court of equity will enforce by way of specific performance, and their operation upon the fund attached as soon as the drawees became possessed of the treasury warrant. 2 Spence, Eq. Jur. 852, 854, 865, 866, 896; Story, Eq. Jur., sects. 783, 1040 *b*, 1040 *c*, 1044, 1055; *Wright* v. *Wright*, 1 Ves. 411; *Beckley* v. *Newland*, 2 P. W. 182; *Sydney* v. *Sydney*, 3 id. 276; *Legard* v. *Hodges*, 1 Ves. Jr. 478.

*Mr. L. L. Lewis, contra.*

1. The orders drawn by Kirk created no lien on the fund subsequently appropriated by Congress for the payment of his claim, and a court of equity was, therefore, without jurisdiction in the case. *Trist* v. *Child*, 21 Wall. 441.

2. So far from being contracts to be specifically executed, they were absolutely null and void by the act of Feb. 26, 1853, 10 Stat. 170.

3. If they were valid for any purpose, the complainant had a plain, adequate, and complete remedy at law.

MR. JUSTICE STRONG delivered the opinion of the court.

Whether the orders, drawn as they were upon a designated fund, made payable to order, and accepted by the drawees, are held by the indorsee free from any equities existing between the payees and the drawer, though the indorsee purchased them without any notice of such equities, is a question which the case does not require us to consider. It has been ably and elaborately argued by the counsel for the appellant, and if the orders could have any legal effect, we might be compelled to answer it. But there is a primary question which must be met and determined before we reach the one principally argued. It is, whether the orders are operative for any purpose. The complainants' case rests upon the assumption that, coupled with the acceptance of the drawees, they created an equitable lien upon the debt due from the United States to the drawer. If they did not, it is plain that the court below had no jurisdiction in equity to grant the relief asked for by the bill. The complainant's only remedy was at law. If they did, it must be because the orders and acceptances amounted to an equitable assignment, *pro tanto*, of the claim of the drawer against the government. The ingenious argument for the appellant is that the orders clothed the respective payees with absolute ownership of the several sums mentioned therein, out of whatever moneys might be coming into the hands of the drawees from the United States for the drawer; and it is said that the fund thus specified was unaffected by the orders, and had only a potential existence in the drawees' hands until it was received by them, but that from the moment of possession they assumed a trust to administer the fund in accordance with the directions given by the orders, having previously accepted them.

Another formal statement of the argument is, that the orders drawn by Kirk upon Hosmer & Co., and accepted by them, created in equity an absolute and irrevocable appropriation of their contents, when collected by the drawees from the drawer's claim against the government, and that when collected the sums named in the orders were held by the drawees in trust for the payees or their assignees. There is no substantial variance in the argument stated in these several forms. However stated, the equitable effect of the orders and accept-

ances, independent of any statutory prohibition, if they had any effect when they were drawn, was to transfer a portion of the drawer's claim against the United States to the payees. After the orders were given and .accepted, the drawer could not in a court of equity insist that he was entitled to the entire amount which might subsequently be allowed for his claim. If, instead of two orders, he had given one for the entire sum which might be awarded to him by the government, there can. be no doubt that it would have divested his whole interest, and vested it in equity in the person in whose favor the order was drawn. In other words, it would have been an equitable assignment of the claim. How, then, can it be that an order drawn upon the fund, or payable out of it, if accepted, is not a partial assignment ? There is nothing in Story's Equity Jurisprudence, sects. 1040 to 1047 inclusive, nor in any of the cases cited by the appellant, inconsistent with our holding that such an order is in equity a partial assignment.

We are brought, then, to the inquiry whether such an assignment of a claim against the United States, made before the claim has been allowed, and before a warrant has been issued for its payment, has any validity, either in law or in equity. The act of Congress approved Feb. 26, 1853 (10 Stat. 170), entitled "An Act to prevent frauds upon the treasury of the United States," re-enacted in sect. 3477 of the Revised Statutes, declares that all transfers and assignments thereafter made of any claim upon the United States, or any part or share thereof or interest therein, whether absolute or conditional, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless the same shall be freely made and executed in the presence of at least two attesting witnesses after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. It would seem to be impossible to use language more comprehensive than this. It embraces alike legal and equitable assignments. It includes powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof. It strikes at every derivative interest, in whatever form acquired, and incapacitates every

claimant upon the government from creating an interest in the claim in any other than himself.

In *United States* v. *Gillis* (95 U. S. 407), we had occasion to examine this act. We then concluded that it embraced every claim against the United States, however arising, of whatever nature, and wherever and whenever presented. We had not, however, before us the precise question which is here presented. That was the case of a suit by the assignee of a claim in the Court of Claims. We held he could have no standing there. We held also that such an assignee could not prosecute the claim in any court, or before the Treasury Department, against the government. We were not called upon to decide whether such assignments were invalid as between the assignor and the assignee. But if after the claim in this case was allowed, and a warrant for its payment was issued in the claimant's name, as it must have been, he had gone to the treasury for his money, it is clear that no assignment he might have made, or order he might have given, before the allowance would have stood in the way of his receiving the whole sum allowed. The United States must have treated as a nullity any rights to the claim asserted by others. It is hard to see how a transfer of a debt can be of no force as between the transferee and the debtor, and yet effective as between the creditor and his assignee to transmit an ownership of the debt, or create a lien upon it. Yet if that might be, — and we do not propose now to affirm or deny it, — the question remains, whether the act of Congress was not intended to render all claims against the government inalienable alike in law and in equity, for every purpose, and between all parties. The intention of Congress must be discovered in the act itself. It was entitled " An Act to prevent frauds upon the treasury of the United States." It may be assumed, therefore, that such was its purpose. What the frauds were against which it was intended to set up a guard, and how they might be perpetrated, nothing in the statute informs us. We can only infer from its provisions what the frauds and mischiefs had been, or were apprehended, which led to its enactment. One, probably, was the possible presentation of a single claim by more than a single claimant, the original and his assignee, thus raising the danger of paying the claim

twice, or rendering necessary the investigation of the validity of an alleged assignment. Another and greater danger was the possible combination of interests and influences in the prosecution of claims which might have no real foundation, of which the facts of the present case afford an illustration. Within our knowledge there have been claims against the government, interests in which have been assigned to numerous persons, and thus an influence in support of the claims has been brought. into being which would not have existed had assignments been impossible. We do not say that the passage of the act was induced by these considerations. It is enough that frauds or wrongs upon the treasury were possible in either of these ways, and it may be that Congress intended to close the door against both. However that may be, the language of the act is too sweeping and positive to justify us in giving it a limited construction. We cannot say, when the statute declares all transfers and assignments of the whole of a claim, or any part or interest therein, and all orders, powers of attorney, or other authority for receiving payment of the claim, or any part thereof, shall be absolutely null and void, that they are only partially null and void, that they are valid and effective as between the parties thereto, and only invalid when set up against the government.

It follows that, in our opinion, the accepted orders under which the appellant claims gave him no interest in the claim of the drawer against the United States, and no lien upon the fund arising out of the claim. His bill was, therefore, rightly dismissed.

*Decree affirmed.*

MR. JUSTICE FIELD did not sit in this case.