## James E. Dexter

*v.*

## Titus B. Meigs and another.

1. An assignment by an Indian nation of a part interest in a claim held by it against the United States, made in accordance with the provisions of section 2103 of the Rev. Stat. U. S., and a sub-assignment made in accordance with the provisions of section 2106, are not prohibited or rendered invalid by section 3477 of those statutes.

2. Where a sub-assignment of a definite sum, part of such a claim, was made to A, in trust for himself and B, C, D and E, five persons, in equal shares, but the names of the persons so interested were not mentioned in the deed of assignment and their rights rested wholly in parol, and B, in requesting A to act as trustee and to advance a certain sum in payment for his interest in the

Dexter *v.* Meigs.

.assignment, represented to him that the parties interested were A, B, C and D, four persons in all, purposely omitting E, whereby A acquired an equity in the proceeds of the assignment superior to E—*Held,* that B's share in the pro-·ceeds must make good to E what E lost by the superior equity of A so created ,by B's misrepresentation.

Final hearing on bill, answer and proofs.

*Messrs. Blair & Crouse,* for the complainant.

*Mr. Gilbert Collins* and *Mr. Willard C. Fisk,* for the defend-.ants.

PITNEY, V. C.

By this bill the complainant claims from the defendant Meigs the sum of $3,000, besides interest, part of a sum of $24,000 received by Mr. Meigs from the treasurer of the United States, ,by his draft, No. 14,773, dated July 12th, 1888.

The jurisdiction of this court is based upon the allegation that Mr. Meigs received the sum in question as trustee for the complainant and other persons interested with him in it.

The payment was made to Mr. Meigs as assignee of one John B. Luce, who was assignee of the Choctaw nation of Indians of a portion of a claim held by said nation against the United :States, and which was finally adjusted and covered into the treasury for payment shortly before the payment to Meigs.

The defendant Meigs admits the receipt of the money, and that .he so received it in trust; but he alleges that the trust was con-fined to himself and three others, one-fourth to each, and he .denies that the complainant had any interest in it.

Other defences were made at the hearing not specifically set out in the answer.

The facts of the case, as they appeared at the hearing, are as .follows :

The Choctaw nation of Indians had a meritorious claim against .the United States finally adjusted at a trifle less than $2,800,000, which had its origin many years prior to the year 1870, and which claim the nation had been trying for years to collect by

successive applications to congress to make the necessary appropriation for that purpose, but without success.

In 1870 the nation made a contract with one Henry E. McKee, of Arkansas, by which he agreed to prosecute the claim and to pay all the expenses attending its prosecution, and to receive for his compensation thirty per centum of the amount realized. McKee continued the prosecution of the claim on the plan of procuring its direct recognition and payment by congress by an appropriation for that purpose, but without success. In 1875 he changed his plan, and set about procuring its reference, by act of congress, to the court of claims, and in 1880 congress passed an act directing that it should be so referred to the court of claims for adjudication and adjustment; and McKee, in pursuance of that act, in June, 1881, presented a proper petition to that court in behalf of the nation.

At this stage of the proceedings McKee found himself embarrassed for want of funds, having already expended all that he could command or raise by ordinary means, and without pledging his interest in the claim. Subsequent to the making of his contract with the Choctaws, congress had passed a series of acts, afterwards consolidated in sections 2103 and 2106 of the second edition (1878) of the Revised Statutes, relative to the dealings between the United States and the Indians, which rendered it impracticable for him to raise money by assigning to a third party a fractional interest in his contract. The legislation referred to did not invalidate his contract, but, under section 2104, he could only realize the compensation therein provided for by submitting his claim for adjustment to the commissioner of Indian affairs and the secretary of the interior, and that could only be done after the establishment of the whole claim.

In order to avoid this difficulty, Mr. McKee procured Mr. Folsom, the duly authorized delegate and agent of the Choctaws, to make an assignment of five per cent. of the nation's claim to one John B. Luce, an attorney, who had been, and afterwards continued to be, in the employ of, or in some way associated with, McKee in the prosecution of the claim. This assignment bears date April 26th, 1881, and was executed with the proper formali-

ties, and was in such form as to entitle it, under the acts above mentioned, to receive, and it did receive, the formal approval of the secretary of the interior and the commissioner of Indian affairs, and was duly recorded in the department of the interior. The amount so assigned was credited on McKee's original contract for thirty per cent. and formed a part of it. The practical result of this assignment was, that Mr. Luce, as such assignee, or his assignee, would, and did, upon the establishment of the claim, receive payment direct from the treasury of the amount so assigned.

In February, 1883, Mr. McKee was again in want of money to pay current expenses in the prosecution of the claim before the court of claims, and through a Mr. John J. Weed, a practicing lawyer in Washington, in his employ in the prosecution of this claim, applied to the complainant, a practicing physician in the city of Washington, to assist him. The amount needed was $5,000, and McKee offered to secure the lender of that sum by an assignment to be made by Luce of $25,000 out of the amount which Luce might receive under his assignment of April 26th, 1881, of five per cent. of the whole amount recovered, which latter amount it was supposed would be at least $4,000,000, and perhaps more. The complainant tried, without success, to interest several persons living in Washington in the project, and finally mentioned it to Mr. John H. Brewer, a member of congress from this state, and he, in his turn, mentioned it to a Mr. Ferris Jacobs, a member of congress from New York. These persons manifested a willingness to look into the affair, and a meeting was brought about by complainant between Brewer, Jacobs, McKee and his leading counsel, Mr. Wilson (of Shellabarger & Wilson), Mr. Weed and the complainant, in which the merits of the claim were explained and discussed. The result was, that Brewer and Jacobs undertook to raise the needed $5,000 on the terms offered, viz., an assignment by Luce to them, or to a trustee to be named by them, of $25,000 out of the proceeds of the claim which would come to Luce under his assignment, or, as it was called at the hearing, on the basis of five to one. The object of having the assignment made to a trustee was to enable Brewer and Jacobs

Dexter v. Meigs.

to divide the advances among their friends as occasion might require; or, in other words, to form a syndicate to raise the money.

As soon as this arrangement was agreed upon, and before anything was done under it, complainant asked how he was to get compensation for his services, and it was proposed by McKee that he should be compensated by a contingent interest to the extent of $5,000, and the amount named in the assignment to be made to secure Brewer and Jacobs should be increased accordingly and made $30,000 instead of $25,000, and this was agreed to by the complainant, Brewer and Jacobs.

. It was understood, as before stated, that Brewer and Jacobs expected to induce other persons to join them, and, as between the two, Brewer undertook to raise $2,000 and Jacobs $3,000. The latter procured, as he said, his uncle, Josiah Lasell, of Massachusetts, and the defendant Meigs, who was his brother-in-law, to join him, and each put $1,000 into the venture. But the circumstances and evidence tend to prove that Lasell's contribution was in reality a loan to Jacobs, and it was finally settled on that basis. The defendant Meigs was chosen to act as trustee for the others, and on the 9th of February, 1883, Luce made an assignment to him (Meigs), under which he finally received the payment in question. It was so executed as to bring it within the provisions of section 2106 of the Revised Statutes, and it received the sanction of the officials there named, was duly recorded, and was officially recognized and acted upon by the treasury officials. That assignment recited the assignment to Luce of the 26th April, 1881, and that Meigs, as trustee,

"Had advanced to Luce certain sums of money [amount not mentioned] for and on account of the said contract, in order to enable him to pay expenses incident to the prosecution of the said claim in the court of claims and in the supreme court."

And in consideration of the said advances, Luce assigned to Meigs, as trustee, the sum of $30,000, payable out of his (Luce's) contract when the amount therein mentioned should become payable to him (Luce). Meigs executed to Luce a paper of the same date, which recited the assignment from Luce to him, and in which

Meigs, as trustee, agreed to pay Luce $5,000 in the manner therein stated.

Brewer paid only $1,000 of the amount assumed by him, so that the amount received by McKee was only $4,000, and by an arrangement made with the complainant's assent, the defendant Meigs re-assigned to Luce $6,000 of the $30,000 covered by his assignment, and the complainant consented to take $4,000, instead of $5,000, for his compensation.

Throughout the transaction Luce acted as the attorney, agent and trustee of McKee, and while I am satisfied that, at the date of the assignment, he had full notice of complainant's interest in it, yet he does not seem to have charged his mind with it, and in his subsequent correspondence with the defendant Meigs treated the affair as if the contributors to the fund advanced were entitled to $6,000 for each $1,000 advanced instead of $5,000, according to the actual contract.

Shortly after the assignment was made Brewer and complainant asked, through Jacobs, for something in writing from Meigs to show their interest in the agreement, and on that occasion Jacobs showed a disposition to take advantage of the situation to ignore the complainant and divide the whole $30,000 among the cash contributors. Brewer remonstrated with him against the injustice of such a course, but in vain. Jacobs said he would not give complainant anything to show for his interest in the assignment because " he hadn't done much anyhow." Shortly afterwards Jacobs became insane, and died in that condition. Lasell also died. Both were non-residents of this state, and each are represented in this suit by an administrator specially appointed by the ordinary for that purpose and made defendant. The defendant Meigs had no notice of complainant's interest in the assignment when he accepted the trust and agreed to advance his $1,000. His first notice of it was in a letter from Mr. Brewer under date of January 27th, 1885. Before, however, he had paid out any of the $24,000 received from the treasurer, he had full and complete notice not only of the claim but of the circumstances, by letter and oral statement from Mr. Brewer and by letter from the complainant, and also by a letter signed by

Messrs. McKee and Weed addressed to him and stating the facts out of which complainant's equity arose. The complainant also himself called in person on the defendant Meigs about the time he received the money and demanded his share, but Meigs refused to recognize his claim and proceeded to pay out and disburse the fund according to his own ideas of the rights of the parties. He paid to Mr. Brewer $6,000 on the express statement by that gentleman that $1,000 of it belonged to the complainant and that he would account to him for it, which he did. And he paid to Mrs. Jacobs, as administratrix of Ferris Jacobs, $10,673.37, which, with $1,326.63 paid to the representatives of Lasell for the $1,000 advanced by him and interest thereon, made up the $12,000 due, upon the Meigs theory, to Mrs. Jacobs. The check to Mrs. Jacobs was dated July 25th, 1888. The money was received by him on the 20th of July, 1888. The payment to Brewer of $6,000 and in the manner above stated, and the payment of $1,000 out of it by Brewer to complainant, reduces his claim upon the fund from $4,000 to $3,000.

No objection was made, either in the answer or at the hearing, to the jurisdiction of this court, and I think it could not have been successfully questioned. It is at least doubtful whether there was any such privity of contract between the defendant and complainant as to enable the complainant to sue him at law for money had and received. Moreover, the rights of other parties were involved, and such parties could not be reached by an action at law. . The defendant makes, in substance, two defences—one of law and the other of fact.

*First.* He says the two assignments, the one from the Choctaw nation to Luce and that from Luce to Meigs, were void under the act of February 26th, 1853, re-enacted in section 3477 of the Revised Statutes of the United States, as construed and applied in the case of *Spofford* v. *Kirk, 97 U. S. 484,* and insists that, as a consequence, he cannot be called upon by any court to account for the money he has received. In the case relied upon, one Kirk had a claim against the government which he employed Hosmer & Co. to collect. Before it was finally allowed and liquidated Kirk drew two several drafts upon Hosmer & Co.,

which they accepted, payable out of the proceeds of the claim when it should come to their hands, and after they were so accepted he sold them to Spofford. After the claim was paid and the money reached Hosmer & Co., Spofford demanded payment of them of his drafts, which was refused. Then, instead of suing Hosmer & Co. at law upon their acceptance of the drafts, he filed his bill in equity against them and Kirk, thereby necessarily, as the court held, basing his claim not upon Hosmer & Co.'s acceptance, but upon his equitable assignment of an interest in the original claim. The court held such assignment was forbidden by the act in question, and dismissed the bill.

The difference between that case and this is apparent. The assignment there was not, as here, executed in accordance with the terms of the act of congress applicable to that case. Moreover, that case was examined and explained in the subsequent cases of *Goodman* v. *Niblack, 102 U. S. 556*, and *Bailey* v. *United States, 109 U. S. 432*. And considered in the light of those cases, and the general principles of equity, I venture to express a doubt as to its soundness.

· In the case in hand the assignments, under which defendants raised the money here in question, were executed in strict accordance with the acts of congress governing dealings with Indian claims ; they received the approval of the proper officials, and were finally recognized and acted upon by the disbursing officers of the treasury. I find no legal infirmity in them, nor do I perceive anything in their consideration contrary to morals or public policy. The act referring the Choctaw claim to the court of claims had been passed two years before the assignment to the defendant, and no further legislation was required until the claim should have been liquidated by that court and passed upon by the supreme court of the United States, after which the insertion of the amount awarded in the proper appropriation bill was a matter of course. There is not the least reason to suppose or suspect that either Brewer or Jacobs were brought into the affair for the purpose of influencing their course in congress, or that the insertion in the assignment of the extra $5,000 for the complainant's benefit was for any other purpose except to ·compen-

sate him for his services in finding persons willing to advance the needed money. This defence of illegality is not set up in the answer and was first broached in the briefs of counsel.

The next defence is one of fact, and denies that any such contract as that above stated was ever made, either with Luce, McKee or Jacobs, and alleges that it was confined to an understanding between Brewer and complainant, to the effect that the syndicate should allow complainant $5,000 out of the $30,000 to come to them, and which understanding Jacobs refused to ratify, and so it never became binding upon Jacobs, Lasell or the defendant. This theory is based by the defendant, in the first place, upon the language of the assignment itself and the circumstance that Luce, in his correspondence with Meigs, subsequent to the assignment, treated the advances as being made on a basis of six to one instead of five to one. But so they were on the basis of six to one as between McKee and Luce on the one side, and the defendants on the other, and it is to be observed that Luce disclaimed all knowledge of how the moneys were to be distributed by the defendant.

He next relies upon the evidence of McKee, taken at Minneapolis, upon interrogatories upon a commission, in which he says that Luce and himself dealt with the complainant as the agent of the syndicate, and that Luce and himself agreed to pay six to one, and that the complainant was to take his commission out of the sum so to be paid to the syndicate. But he expressly states that he understood from the conversation of Brewer and Jacobs that the syndicate was to receive but $25,000 out of the $30,000, and that the complainant was to have the other $5,000. And the joint letter written by him and Mr. Weed to the defendant, under date of July 16th, 1888, states the facts as they were testified to by complainant, Mr. Weed and Mr. Brewer at the hearing. The evidence of the two last-named gentlemen was clear and quite satisfactory in its character, and fully establishes the facts as I have already stated them. Defendant attempted to show that Mr. Brewer was mistaken, by producing a letter from him to the defendant under date of January 30th, 1885, in which he uses this language :

Dexter *v.* Meigs.

" The first amount offered us was $25,000, and then Dexter came to me and said he should have an interest, to which I agreed, but said to him that the matter should have been spoken of sooner.   Then he said, ' I believe I can get them to make it $30,000, and then I will take that last portion as my commission in the matter.'   I said, ' Go ahead.'   After it was all done Jacobs did not seem inclined to carry out what I had agreed to do, and treated Dexter in a very unfair manner I thought."

and argues from it that Jacobs never agreed to allow complainant the $5,000.   But, by the language used, and without any explanation, Jacobs had agreed to take five for one, and the additional one for one was added to the assignment for the benefit of complainant, and all to the knowledge of Jacobs.   And I do not perceive how the right of complainant to receive the $5,000 could be destroyed, or the right of Jacobs and his friends in the syndicate to receive any part of that sum could be created by a mere non-participation on his and their part in the arrangement by which it was added to the amount originally agreed to be put in the assignment.   The syndicate got all they originally bargained for without touching the additional $5,000.   But both Mr. Weed and Mr. Brewer swear that Jacobs knew of, and con-, sented to, the arrangement by which the additional $5,000 was inserted for the complainant's benefit, and I believe their evidence.   Mr. McKee, in effect, swore to the same thing.

As against Mr. Jacobs and his estate, it seems to me complainant's claim must prevail.

It is said that it has very little of merit, that he did very little.   But he did enough to induce Messrs. McKee and Luce to give him $5,000 in case the principal claim was established and paid, and it does not lie in the mouth of Mr. Jacobs's representative to say that his claim is lacking in merit, unless she can show a more meritorious claim to the fund in question, and in that she entirely fails.

Defendant Meigs's claim to the extra $1,000 stands upon a somewhat different footing.   He seems to have advanced his money, or at least to have come under obligations to advance it, upon the representation made by Jacobs, that the syndicate was to advance $5,000 for the $30,000 assigned, and he denies all notice of complainant's claim until he received Mr. Brewer's

32

letter of January 27th, 1885, two years after entering into the obligation.

It will be observed that the assignment from Luce to the defendant is expressed to be in consideration of moneys advanced, but it does not fix or mention any sum of money as having been advanced, or agreed to be advanced. All the information defendant had besides what the assignment discloses he got from Jacobs. The assignment contains no hint of complainant's claim, and defendant learned from Jacobs that the amount to be advanced was $5,000, and the persons advancing it were to receive $30,000.

Now, it seems to me that the defendant was entitled to act upon this information—which was true so far as regards the amount to be advanced—and that he thereby acquired an equity superior to that of the complainant. The fatal defect in this part of complainant's case is, that having succeeded in procuring McKee to agree to give him $5,000, and for that purpose to add that much to the sum named in the assignment to the syndicate's trustee, he did not either insist upon having his name mentioned in the deed of assignment or upon having an acknowledgment of it from the trustee named therein. This he failed to do, being content, as he said, to trust to Brewer and Jacobs. He thereby, as it seems to me, put it in their power to cut off his equity as against all those who should be induced to advance their money on the strength of the assignment itself. Such persons occupy the position of *bona fide* purchasers without notice.

Complainant argues that Jacobs occupied the position and acted as the agent of the defendant Meigs in this transaction, and that he is therefore bound by the acts and agreements of his agent, whether reported to him or not. If it had appeared that Jacobs was the general agent of Meigs, with discretionary powers, for the investment of money, and that Meigs trusted to him for that purpose, there would be much force in the position. But I can find no evidence to show any such agency. The project was launched by Brewer and Jacobs, and the latter suggested to defendant Meigs to contribute $1,000, on the representation that he would receive for it $6,000, if the claim succeeded, and after-

Dexter v. Meigs.

wards seems to have persuaded him to act as trustee. There was no such agency as would support the complainant's position.

Meigs claims, in behalf of the Lasell share, that Lasell advanced his money on the strength of the assignment and occupied the same position that he (Meigs) did and does, and is entitled to the same defence against complainant's equity; and that, being in the position of a *bona fide* purchaser without notice, he could transfer the benefit of that position to Jacobs's estate, although both Jacobs and his administratrix had notice of complainant's equity, and this, he says, was, in effect, what was done.

Now, I think it plain that, complainant having established his prior equity to this fund, the burden is on those who claim against it to show by affirmative proof a better equity. This has been done, as I think, by the defendant Meigs; but as to Lasell's $1,000 there is no evidence whatever that he ever saw the assignment, or as to what representations, if any, were made to him by Jacobs, and I am unwilling to assume, as I am invited to do by defendant's counsel, that Jacobs made the same representations to Lasell as to the defendant Meigs. The assignment is silent as to who were to be benefited by the trust. Complainant has proven, by competent evidence, that he was interested in the fund covered by it to the extent of $5,000 (afterwards reduced to $4,000), and there is no evidence whatever as to the representations upon which Lasell advanced his money. There is no competent proof in the case whatever as to any advance being made by Lasell. The bill alleges that he advanced $1,000, on the understanding that he was to have $5,000 for it. The answer admits the advancement but alleges that it was on the basis of six to one. Of this latter there is no proof. A fair inference, however, from the circumstances and the evidence of the defendant Meigs is, that it was at all times considered as a loan to Jacobs; and Meigs, in effect, so swears. Of course, if it was in its inception a mere loan to Jacobs, there is an end to the case. And then even if it be treated as a contribution to the fund and at the same risk as the other contributions, I think the claim to more than $5,000 on account of it must fail for want of proof

of any facts giving it an equity superior to that of the complainant.

This renders it unnecessary to determine whether, if it were shown that Lasell occupied the same position as the defendant Meigs, a pure gift by Lasell to Jacobs of the proceeds of the venture would invest Jacobs with an equity against the complainant, acquired by Lasell through the fraud practiced by Jacobs on the complainant in making an untrue representation to Lasell in that respect.

The question so presented was not argued, and I dismiss it, with the remark that I should require authority to satisfy me that Jacobs could, under the circumstances, shelter himself under Lasell's equity.

So far I have considered the case as if complainant's rights were limited by his equities against each individual member of the syndicate, and, determined on that basis, I find he would be entitled to a decree against the defendant for $2,000 only of the $3,000 claimed.

But there is another view of this case which, it seems to me, must be considered. I have already stated that defendant Meigs had full notice of complainant's demand in all its aspects before he paid out any moneys. Having that notice, it seems to me very plain that his duty, as well as his privilege, occupying as he did the position of a trustee, was to hold the fund in his hands until the rights of all parties in it should be judicially determined; and he might well himself have instituted a suit for that purpose, bringing in all the parties to interplead. But he chose to act upon his own judgment as to the rights of the parties, and to determine that complainant had no enforceable demand against the fund, and to proceed accordingly. Having done so, I think the case must be considered, as in fact it has already been considered, in all respects as if the fund were still in the hands of the trustee and all parties were before the court. No injustice will be done to the estate of Jacobs by this course, since it is manifest that the defendant Meigs acted throughout the hearing in the interest of that estate, and its interests were quite as well

Dexter *v.* Meigs.

cared for as if the foreign administratrix had been present as a party looking after her own interests.

Considering, then, the fund as still in the trustee's hands, and that the defendant Meigs has established an equity to have $6,000 out of it as against everybody else's interest in it, the question arises, whether that circumstance will prevent the complainant from having his full claim of $3,000 satisfied out of the fund remaining after paying the defendant Meigs his $6,000 before the estate of Jacobs can be paid.   It seems to me difficult to discover any reason why it should.   Mr. Jacobs had full notice of complainant's rights, and saw fit, in complete disregard of them, to represent untruly to defendant Meigs that the persons who advanced the money were to receive $6 for every $1 advanced instead of $5 for every $1, as the fact was, and thereby, by such misstatement, gave Meigs a greater equity in the fund than he was entitled to as against the other persons interested in it. Jacobs having done that, it seems to me quite plain that his share in the fund must in the first place make Meigs's equity good.

The case stands precisely as it would have stood if Jacobs had stated to Meigs (as he might have done successfully, since no amount was named in the assignment) that the amount to be advanced was $4,000 instead of $5,000, and that for each $1,000 advanced the advancer was to receive $7,500, and Meigs had advanced his money in good faith upon that basis.   If he had done this, can there be the least doubt that, as between Mr. Brewer and the estate of Jacobs, the former would be entitled to the same payment out of the fund as if no such untrue statement had been made?   I think there can be but one answer to this question.   Mr. Jacobs created Mr. Meigs's extra equity in the fund by an untrue statement to him, and his (Jacobs's) share must make that extra equity good.

Complainant was entitled to have $4,000 out of the fund.   He has received $1,000 through Mr. Brewer, and he is now entitled to a decree against the defendant Meigs for $3,000, with interest from July 20th, 1888.