MILLIKEN v. BARROW.

BARROW v. MILLIKEN.

(Circuit Court, E. D. Louisiana. January 28, 1895.)

Nos. 12,325 and 12,220.

1. CLAIMS AGAINST THE UNITED STATES—ASSIGNMENT—SECTION 3477, REV. ST.
   The provisions of section 3477, Rev. St., prohibiting and making void transfers of any claim against the United States, before the allowance of such claim, apply only to claims existing, at the time of the transfer, in the form of a right to demand money from the United States, and not to cases where, at the very inception of a transaction out of which a claim against the United States may arise, one party assigns to another the contingent profits he hopes to make, but which do not then exist, and can only be secured by the loan of the assignee's money to the assignor.

2. SAME.
   B., a sugar planter, in March, 1892, in order to secure advances to be made by one M., gave to M. a mortgage on his plantation, which also contained a clause assigning and pledging to the mortgagee any and all bounties which should be allowed B. by the government of the United States, pursuant to the act of congress of October 1, 1890, upon sugar made by B. during that year, agreeing to indorse and deliver to the mortgagee all warrants and checks received for such bounty. No sugar had then been raised or bounty earned, but, subsequently, claims for bounty for the year 1892 were allowed by the government and paid. M. claimed the amount of such bounty, to be applied on his mortgage, and the syndic of B.'s estate, appointed in insolvency proceedings, claimed that the same should be paid to him for the benefit of B.'s general creditors. *Held*, that the prohibition of assignment of claims against the United States, contained in section 3477, Rev. St., did not apply, the case not being within the mischief of the statute, and that M. was entitled to receive and retain the proceeds of the bounty to the extent of the balance remaining due upon his mortgage for advances in 1892.

These were two causes heard together as an equity cause, under a stipulation of the parties, the first being an action at law by Richard Milliken against Cordelius J. Barrow to recover a balance of account, and the second a suit in equity by Alexander D. Barrow, syndic of the estate of C. J. Barrow, against said Richard Milliken to enjoin proceedings in the former suit.

The material portions of the agreed statement of facts are substantially as follows:

It is hereby agreed between the plaintiff and the defendant, through their undersigned counsel, that a jury in this case shall be waived and the case shall be tried before the court on the following statement of facts, and documents annexed and made part of the statement of facts.

C. J. Barrow was a sugar planter residing and doing business in the parish of West Baton Rouge. Richard Milliken is a commission merchant residing and doing business in the city of New Orleans. Milliken had made advances to Barrow to make the crop of the year 1890, and at the close of the crop year, on the 18th day of February, 1891, Barrow was indebted to Milliken in a balance of $6,081.81. On the 2d of March, 1891, the parties appeared before Edgar Grima, a notary public, and executed two notes, secured by a mortgage on Barrow's plantation; the first note, for $6,081.81, being for the balance then due to Milliken, and the second, for $11,918.19, being intended to cover advances that might be made by Milliken to Barrow to make crops upon his plantation in the year 1891. At the close of the year 1891, to wit, on March 10, 1892, there was a balance due Milliken on the whole indebtedness, inclusive of the note of $6,081.81, and interest

thereon, of $20,305.41, and against this balance there remained outstanding and uncollected claims against the United States, for bounty on sugar produced by Barrow during the year 1891, of $5,494.58. On March 14, 1892, Barrow and Milliken appeared before Edgar Grima, notary public, and Barrow executed his note for $15,000, and secured the same by a mortgage upon the property therein described, and agreed to all the stipulations therein contained. including the following: "Now, to secure the faithful performance of each and all of the foregoing obligations, the reimbursement and payment of all costs, charges, expenses, and commissions aforesaid, said mortgagor does by these presents further specially mortgage and hypothecate the hereinbefore described plantation, and all appurtenances thereof, unto and in favor of said mortgagee, and all holders of said note, and does hereby transfer, assign, and pledge unto said mortgagee, and all holders of said note, any and all bounties which shall or may be allowed to said mortgagor by the government of the United States on the sugar made on said plantation during the present year, 189–; hereby agreeing to deliver, properly assigned and indorsed, to said mortgagee all and every certificate and other evidence of claim against the United States for such bounty, and any and all drafts or checks given for said bounty."

The object of the execution of this note and mortgage was to cover advances to be made by Milliken for the making of the sugar crop on his plantation, mortgaged in the act, for the year 1892. The amount of such advances, made in the interval between March 10, 1892, and January 21, 1893, exclusive of interest, was the sum of $18,142.55; and the amount credited to Barrow during such period, exclusive of interest, was the sum of $21,485.62. Of this sum of $21,485.62, $5,518.53 thereof was composed of sugar bounty checks for sugar bounty granted by the United States government to Barrow for making sugar on the said plantation during the year 1891, which checks were collected at various dates in the months of March, April, and May, 1892, leaving the amount of the proceeds of the crop for the year 1892 to be the sum of $15,967.09, without interest. The accounts between the parties were kept on the books of Richard Milliken. The court is to consider these accounts, and the facts therein stated, and the inferences to be drawn therefrom, as fully as if the same were set forth in this statement of facts. It appears by these accounts that on the 21st of January, 1893, there appeared to be a balance due by Barrow to Milliken, on all of the transactions aforesaid, of $18,492.78, and as security for this balance Milliken held in his possession the three mortgage notes described in the foregoing acts of mortgage. On the 31st of January, 1893, Richard Milliken filed executory proceedings in the United States circuit court for the Eastern district of Louisiana against Cordelius J. Barrow. On February 6, 1893, Richard Milliken filed a motion in said cause in the following terms, to wit: "On motion of plaintiff herein, through his counsel, Semmes & Legendre, and on suggesting to the court that the sum of twenty-nine thousand eight hundred and ten 86/100 dollars was erroneously claimed of the defendant under the petition filed in this cause; that the mortgage claims due by defendant to plaintiff on the day this suit was brought amounted to eighteen thousand four hundred and ninety-two 78/100 dollars, with eight per cent. interest from January 8, 1893; and on further suggesting to the court that plaintiff wishes to enter a discontinuance of his suit, and a remittitur of his demand, in so far as the same exceeds the sum of eighteen thousand four hundred and ninety-two 78/100 dollars, costs and attorney's fees exclusive, which are not waived,—it is ordered by the court that this suit be discontinued to the extent of eleven thousand three hundred and eighteen 15/100 dollars, and that it be maintained in full force and effect for eighteen thousand four hundred and ninety-two 78/100 dollars, with interest, costs, and attorney's fees." The proceedings in this cause were subsequently stayed by an injunction issued at the suit of the plaintiff in this present cause, the syndic of Cordelius J. Barrow.

On the 26th of January, 1893, C. J. Barrow presented to the judge of the Fourteenth judicial district court for the parish of West Baton Rouge, the place of his domicile, a petition, under the insolvent laws of the state of Louisiana, for the surrender of his property, and the court on that day en-

tered an order accepting the surrender. This petition was filed in the clerk's office on the following day, the 27th of January. On the 31st of January, 1893, Alexander D. Barrow, plaintiff in this cause, was appointed provisional syndic of the estate of C. J. Barrow, and he was subsequently, at a meeting of the creditors, appointed syndic. During the years 1891 and 1892 the said C. J. Barrow duly qualified himself as a sugar producer and manufacturer under the provisions of an act of congress of date October 1, 1890, and thereby, as such sugar producer, became entitled, upon compliance with the rules and regulations of the treasury department of the United States, to receive sugar bounty, for which sugar bounty, in due time, checks were issued to the order of C. J. Barrow, and those checks were forwarded to C. J. Barrow at New Orleans, to the care of Richard Milliken. For the crops of the year 1892 the following checks were forwarded: On March 14, 1893, a check for $1,624.61; on March 13, 1893, a check for $1,838.60; on May 19, 1893, a check for $23.90; on April 11, 1893, a check for $2,689.38. These bounty checks are now in the possession of the defendant in this cause, Richard Milliken, and amount in the aggregate to the sum of $6,176.51. The insolvent, C. J. Barrow, has never indorsed the same. In his schedule of assets filed with his petition in January, 1893, C. J. Barrow did not set forth these bounty checks. Proceedings were taken by the syndic, Alexander D. Barrow, in the insolvency proceedings against C. J. Barrow, to compel the surrender of these checks. Said proceedings were terminated by a judgment in favor of the syndic, perpetually enjoining and restraining the said Barrow from collecting any of the said treasury checks, and from indorsing the drafts in blank to any other person than the syndic of the insolvent estate, and directing the said Barrow to surrender the said treasury drafts to his creditors as part of his assets, properly indorsed in favor of the syndic of his estate, to be distributed among his creditors according to law. It is admitted that Richard Milliken was no party to this judgment in the state court. It is further admitted that no imputation of payments has ever been made by the said Milliken under the two notarial contracts aforesaid, further than appears as a matter of law from the manner in which the account current, above annexed and referred to, was kept upon his books, and as appears as a matter of law on the face of the pleadings and papers in the executory proceedings against C. J. Barrow.

Semmes & Legendre, for Richard Milliken.

Farrar, Jonas & Kruttschnitt, for Alexander D. Barrow, syndic.

PARLANGE, District Judge. By agreement of parties, the two above-entitled causes have been consolidated, and are to be tried as an equity cause, under the style of "Richard Milliken v. Alexander D. Barrow, Syndic, No. 12,325." The jury has been waived in writing in the case at law, and the parties have stipulated that the whole matter shall be tried by the judge on the agreed statement of facts. By a notarial act of mortgage, executed on March 14, 1892, C. J. Barrow declared himself to be indebted to Richard Milliken in the sum of $15,000, amount of loan which Barrow obtained from Milliken to enable him to work and cultivate, during the year 1892, the sugar plantation described in the act. The clause in said act on which the complainant, Milliken, relies to obtain the relief which he prays for, is as follows:

"Now, to secure the faithful performance of each and all of the foregoing obligations, the reimbursement and payment of all costs, charges, expenses, and commissions aforesaid, said mortgagor does by these presents further specially mortgage and hypothecate the hereinbefore described plantation, and all appurtenances thereof, unto and in favor of said mortgagee, and all holders of said note, and does hereby transfer, assign, and pledge unto said mortgagee, and all holders of said note, any and all bounties which shall or

may be allowed to said mortgagor by the government of the United States on the sugar made on said plantation during the present year, 189—; hereby agreeing to deliver, properly assigned and indorsed, to said mortgagee, all and every certificate and other evidence of claim against the United States for such bounty, and any and all drafts or checks given for said bounty."

Section 3477, Rev. St. U. S., reads as follows:

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration thereof, and all powers of attorney, orders or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuance of a warrant for the payment thereof. Such transfers, assignments and powers of attorney, must recite the warrant for payment and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer at the time of the acknowledgment, read and fully explained the transfer, assignment or warrant of attorney, to the person acknowledging the same."

The defendant contends that section 3477, Rev. St., is an insuperable obstacle in the way of the complainant, and that the agreement between Barrow and Milliken, concerning the sugar bounty, was the assignment of a claim upon the United States, within the prohibition of section 3477, Rev. St. The complainant contends that while the agreement may be null under the statute cited, as between the parties and the government, it is binding as between the parties themselves; citing, in support of this proposition, Bailey v. U. S., 109 U. S. 437, 3 Sup. Ct. 272; Goodman v. Niblack, 102 U. S. 556. I have carefully considered the decisions interpreting section 3477, Rev. St.: Trist v. Child, 21 Wall. 446; U. S. v. Gillis, 95 U. S. 407; Spofford v. Kirk, 97 U. S. 484; Erwin v. U. S., 97 U. S. 394; McKnight v. U. S., 98 U. S. 179; Goodman v. Niblack, 102 U. S. 556; Bailey v. U. S., 109 U. S. 432, 3 Sup. Ct. 272; St. Paul & D. R. Co. v. U. S., 112 U. S. 733, 5 Sup. Ct. 366; Trust Co. v. Shepherd, 127 U. S. 494, 8 Sup. Ct. 1250; Butler v. Goreley, 146 U. S. 313, 13 Sup. Ct. 84; Lopez v. U. S. (Court of Claims) 35 Int. Rev. Rec. 31; Howes v. U. S. (Court of Claims) 35 Int. Rev. Rec. 55.

It results clearly, from the decisions just cited, that section 3477, Rev. St., prohibits the voluntary assignment of claims upon the United States; but that the devolution of claims, by operation of law, to heirs, devisees, assignees in bankruptcy, and assignees or syndics under state insolvent laws, is not within the prohibition. It is also clear that powers of attorney to collect claims upon the United States, and voluntary assignments of such claims, are revocable at will, prior to the payment of the claims by the government. If the real question in this case were whether Barrow could make an irrevocable and enforceable assignment of a claim upon the United States, before the allowance of the same, the claim being in esse at the time of the assignment, the case would have to go against the complainant. The supreme court, in Spofford v. Kirk, 97 U. S. 489, discussing the same contention which is now made here by the complainant, to wit, that the agreement was null quoad the government, but valid as between the parties, said:

"It is hard to see how a transfer of a debt can be of no force, as between the transferee and the debtor, and yet effective, as between the creditor and his assignee, to transmit an ownership of the debt or create a lien. * * * We cannot see, when the statute declares that all transfers and assignments of the whole of a claim, or any part or interest therein, and all orders, powers of attorney, or other authority for receiving payment of the claim, * * * shall be absolutely null and void, that they are only partially null and void, and that they are valid and effective as between the parties thereto, and only invalid when set up against the government."

It is settled by the highest authority that the sole object of the statute is to protect the government, not the claimant. Goodman v. Niblack, 102 U. S. 560; Bailey v. U. S., 109 U. S. 439, 3 Sup. Ct. 272. Section 3477, Rev. St., is the act of February 26, 1853, carried into the Revised Statutes. Its title, which should be noticed, is "An act to prevent frauds upon the treasury of the United States." The statute would utterly fail in its sole object, if powers of attorney and assignments were irrevocable and enforceable by the courts. It is settled that they are revocable and unenforceable. Spofford v. Kirk, 97 U. S. 489; Bailey v. U. S., 109 U. S. 439, 3 Sup. Ct. 272; Lopez v. U. S. (Court of Claims), above cited. In Bailey v. U. S., relied upon by complainant, where a party was allowed a large sum by the government, and the same was paid to an agent of the claimant under a power of attorney which the claimant had executed before the allowance, but which he had permitted to remain unrevoked after the allowance, and the claimant sued the government to make it pay the claim a second time, it was simply held that the claimant was estopped. By not revoking the power of attorney which he had granted before the allowance, and permitting it to remain in force, the claimant gave it the same effect as a power of attorney executed after the allowance.

In my opinion, the pivotal point in this case is one which has not been raised. The real and decisive question is whether when, in March, 1892, Barrow, hoping and expecting to raise a crop of sugar cane, and to make sugar therefrom at the end of the year, assigned to Milliken the government bounties which he hoped to earn at the end of the year, there was then, at the time of the execution of the assignment, a claim in esse upon the United States, the assignment of which is stricken with nullity by section 3477, Rev. St., and whether such a transaction is within the evils intended to be remedied by the statute. One of the controlling canons in the interpretation of statutes is that the meaning of the law can be ascertained by the mischiefs which the law was enacted to remedy. If the mischiefs are ascertained, and a case arises which is not within those mischiefs, it is beyond dispute that the case is outside the operation of the law. We have clear and positive authority as to the mischiefs intended to be prevented by the act of February 26, 1853 (section 3477, Rev. St.). In Goodman v. Niblack, 102 U. S. 560, the supreme court, referring to its previous declaration on the subject in Spofford v. Kirk, 97 U. S. 489, said that these mischiefs are mainly two: (1) The danger that the rights of the government might be embarrassed by having to deal with several persons instead of one, and by the introduction of a party who was a

stranger to the original transaction. (2) That, by a transfer of such a claim against the government to one or more persons not originally interested in it, the way might be conveniently opened to such improper influences, in prosecuting the claim before the departments, the courts, or the congress, as desperate cases, when the reward is contingent on success, so often suggest. In Spofford v. Kirk, the supreme court had said that the greater of the two evils was the possible combination of interests and influences in the prosecution of claims which might have no real foundation. The statement of the mischiefs intended to be remedied is again made in Bailey v. U. S., 109 U. S. 438, 3 Sup. Ct. 272. There is a noticeable reiteration in the language of the supreme court with regard to the introduction of a party "who was a stranger to the original transaction," and the transfer of a claim to one or more persons "not originally interested in it."

In my opinion, it is clear that the transaction now under consideration comes under neither class of evils formulated by the supreme court. The transaction could not embarrass the government accountants, for it was never contemplated that Milliken should ever present any claim to the government as part owner or as assignee. The stipulation was that after the warrants were issued, that is to say, after the government was virtually done with the matter, Barrow was to indorse the warrants to Milliken. This could embarrass or involve the government accountants in no manner whatever. As to the second evil, which the supreme court says is the greater of the two, congress enacts a public statute to promote the production of sugar by the offer of a fixed public bounty, the payment of which is provided for in advance by regulations which are to apply to all who may earn the bounty. A person desiring to avail himself of the offer, but having no money to engage upon the enterprise, goes to another, and, upon obtaining from him the requisite means, assigns to him, as security for reimbursement, the bounty which he hopes to earn. Can this transaction be said to be the transferring or parceling of an existing debt against the United States to a stranger to the original transaction or to one not originally interested in it? Can it be said that such a transaction, entered into for the purpose of doing a thing which the government wishes to be done and encourages by the offer of its bounty, is one of the dangerous bargains from which the act of 1853, as its main object, intended to protect the departments, the congress, and the courts? In my opinion, it undoubtedly is not such a bargain. If a man without means, wishing to endeavor to earn the sugar bounty, goes to another who has the necessary resources, and enters into a partnership with him to carry on the enterprise, no one would claim that the transaction was in any manner obnoxious to section 3477, Rev. St. What different principle arises, if, instead of entering into such a partnership, one should borrow from another the necessary funds to carry out a lawful purpose, which the government encourages by the offer of a public bounty? See Calder v. Henderson, 4 C. C. A. 584, 54 Fed. 806. In my judgment, there is an obvious difference between a case where an existing debt against the

,government is transferred to a stranger to the transaction, and another case where, at the very inception and origin of the transaction, one party assigns to another the contingent profits he hopes to make from a lawful enterprise, promoted by government aid, the carrying on of which enterprise being only made possible by the loan of the assignee's money to the assignor. In March, 1892, did Barrow have "a claim upon the United States," within the intendment of section 3477, Rev. St.? He might never have made a single hogshead or pound of sugar. What he had in March, 1892, was the hope of making sugar, and thereby earning the bounty at the end of the year. I make the following extract from the syllabus in the case of Hobbs v. McLean, 117 U. S. 567, 6 Sup. Ct. 870:

"A., having contracted with the United States to furnish supplies of wood and hay, * * * entered into partnership with B. and C. for the purpose of executing the contract. A. was to furnish half the capital, B. and C. one-fourth each, and profits and losses were to be divided on that basis; but, in fact, the capital was furnished by B. and C. A. delivered the wood according to contract, but failed to deliver the hay, and, payment being refused, he brought suit to recover the contract price of the wood. In this suit B. and C. each was a witness on behalf of A., and each testified that he had 'no interest, direct or indirect, in the claim,' except as creditor of A., holding his note. Pending the suit, A. became bankrupt, and then died. His administratrix was admitted to prosecute the suit, but, before entry of final judgment, his assignee in bankruptcy was substituted in his place. Final judgment was then rendered in favor of the assignee, and the amount of the judgment was paid to him. B. and C., as surviving partners, then filed a bill in equity against the assignee and the attorneys to recover their shares in the partnership property. Held, that the interests of B. and C. in the partnership were not affected by the fact that the contract under which they claimed was not made and attested by witnesses after the issue of a warrant for payment, as required by Rev. St. § 3477; that they were not affected by the provisions of section 3737, Rev. St.; that a transfer of a contract with the United States shall cause an annulment of the contract so far as the United States are concerned."

In that case the supreme court said:

"What is a 'claim against the United States' is well understood. It is a right to demand money from the United States. Peck acquired no claim, in any sense, until after he had made and performed, wholly or in part, his contract with the United States. Section 3477, it is clear, only refers to claims against the United States which can be presented by the claimant to some department or officer of the United States for payment or may be prosecuted in the court of claims. The section simply forbids the assignment of such claims before their allowance."

It is therefore perfectly clear that in March, 1892, Barrow had no "claim upon the United States," within the intendment and prohibition of section 3477, Rev. St.

I reiterate that the act of 1853 was not intended to protect claimants. There is nothing contained in it which was intended to assist a claimant in resisting the enforcement of his contracts. When, as in Spofford v. Kirk, the court refused to compel the claimant to carry out his agreement, it was only because this had to be done in order to give the government the protection which was the sole object of the enactment of the statute. Natural justice plainly requires that such an agreement as the one under consideration should be enforced, unless there be some special prohibition. I find that

no such prohibition exists in this case. Doubtless Barrow would in good faith have carried out the agreement, and this case would never have arisen but for the fact of his supervening insolvency. In Ellett v. Butt, 1 Woods, 218, Fed. Cas. No. 4,384, cited by complainant's counsel, the court cited Justice Story's language in Mitchell v. Winslow, 2 Story, 631, Fed. Cas. No. 9,673:

"It seems to me a clear result of all the authorities that whenever the parties, by their contract, intended to create a positive lien or charge, either upon real or personal property, whether then owned by the assignor or contractor or not, or, if personal property, whether it is then in esse or not, it attaches as a lien in equity or charge upon particular property as soon as the assignor or contractor acquires a title thereto," etc.

Ellett v. Butt was affirmed in 19 Wall. 544.

The Civil Code of Louisiana says:

"Art. 2450. A sale is sometimes made of a thing to come; as of what shall accrue from an estate, of animals yet unborn, or such like other things, although not yet existing.

"Art. 2451. It also happens sometimes that an uncertain hope is sold; as the fisher sells a haul of his net before he throws it; and although he should catch nothing, the sale still exists, because it was the hope that was sold, together with the right to have what might be caught."

A hope or expectation of gain or profit in some enterprise may form the object of a contract of sale. Slidell v. McCoy's Ex'r, 15 La. 340; Dobard v. Bayhi, 36 La. Ann. 136. That equity, in the absence of a special prohibition, will enforce such an agreement as the one under consideration, is perfectly clear. See Spofford v. Kirk, 97 U. S. 488, where the question was passed upon. In Re Clarke, 36 Ch. Div. 354, cited by complainant's counsel, Bowen, L. J., quoted approvingly the language of the court in Holroyd v. Marshall, 10 H. L. Cas. 191, as follows:

"If a vendor or mortgagor agrees to sell or mortgage property, real or personal, of which he is not possessed at the time, and he receives the consideration for the contract, and afterwards becomes possessed of property answering the description in the contract, there is no doubt that a court of equity would compel him to perform the contract, and that the contract would in equity transfer the beneficial interest to the mortgagee or purchaser immediately on the property being acquired."

See, also, Tailby's Case, 13 App. Cas. 534, cited by complainant's counsel.

But, notwithstanding my views of the law as above expressed, it does not follow that the complainant is entitled to all the relief he prays for. The bounty warrants in dispute amount to $6,176.49. The amount for which Barrow remained indebted to Milliken for the crop of 1892 is less than the amount of the checks. The assignment of the eventual bounty was clearly and expressly made to secure the payment of the advances for 1892, and no reasonable implication arising in this case could extend it to the securing of any antecedent indebtedness of Barrow to Milliken. Nor is it contended that it should be so extended. But in the act of mortgage of March 14, 1892, a clause is contained giving the complainant the right to apply the proceeds of sale of the crop of 1892 to any indebtedness which might then be due to the complainant by Barrow on open account; it being stipulated that such imputation would not lessen or

impair the indebtedness evidenced by the act of mortgage of March 14, 1892. At the time of the execution of this act, Barrow was already indebted to Milliken for advances made prior to March 14, 1892. The contention is that Milliken had the right, under the clause just mentioned, to take the proceeds of the crop of 1892, and apply them to the indebtedness antecedent to the act of mortgage of March 14, 1892. The result would be to leave this act of mortgage in force for an amount sufficient to cover all the bounty warrants in dispute. It is clear that, in order to sustain this contention, it must appear that the complainant made the imputation. It is not claimed that there was any express imputation, and the matter is submitted on the inferences to be drawn from the manner in which the accounts between complainant and Barrow were kept. I find the inferences to be strongly against complainant's contention on this point. Those accounts contain no indication whatever of any intention to make a special imputation. The indebtedness, from the inception of the transactions between complainant and Barrow, long prior to the mortgage of March 14, 1892, is treated as one continuous indebtedness. The account begins with a charge for balance of account on February 18, 1891,—evidently the balance for the advances of 1890. Another balance is drawn on March 9, 1892, and a note appears at the foot of the account that the uncollected bounty claims (for 1891), when collected, "are to be credited to this account." The balance drawn March 9, 1892, is charged on March 10, 1892, being the total indebtedness on all antecedent transactions to that date. To this balance are added, on the debit side, all the advances of 1892. On the credit side, appear the entries for the proceeds of the sale of the crop of 1892, without any indication of an intention to make a special imputation of the amounts. A final balance is drawn on January 21, 1893, which is the whole amount due by Barrow on all the transactions. At the foot of the last account, appears a note that the bounty claims for 1892 (the warrants for which are in dispute in this case) "will be credited to this account when received." Under such circumstances, it is perfectly clear that there was no special imputation. When complainant simply entered on the credit side of his account the proceeds of the crop of 1892, there being then on the debit side both the old and the new debts, it certainly cannot be said that the credit went to one debt rather than to the other. When it is the debtor of several debts who makes a payment and wishes to impute it, the law says that he must state the imputation, or else the law makes the imputation for him. If, as in this case, he yields to his creditor his right to impute, the creditor must state the imputation. In this case the creditor has not done so. On the contrary, the inference is irresistible that he never intended to make, and that he did not make, a special imputation. The matter is clearly one in which the imputation must be made by law. "When a factor who has made advances to a planter, and who has a mortgage upon his plantation to secure an antecedent debt, receives the crop of the planter, the proceeds of the crop must be imputed to the payment of the advances, before any part of the crop may be applied to any other obligation." Richard-

son v. Dinkgrave, 26 La. Ann. 658; Given v. Alexander, 25 La. Ann. 71; Jackson v. Lemle, 35 La. Ann. 857. "As appears from the mortgage, the advances were made to defendant in his planting operations, and were specially secured by a privilege on his crops, etc. As heretofore held, the proceeds of the crop were imputable to the privilege, and not the mortgage." Flower v. O'Bannon, 43 La. Ann. 1046, 10 South. 376. Counsel will prepare a decree in favor of the complainant, in accordance with the views herein expressed, and submit the same to the consideration of the court.