ANNA M. FORREST, administratrix of the estate of Samuel Forrest, deceased,

v.

RODMAN M. PRICE et al.

1. It is no excuse for contempt of an order of court that the order is founded on error of law or fact. The error must be questioned by direct proceedings to review the order, not by disobedience.

2. The contemner of an order of a court, however, may show, in defence, that the court was without jurisdiction to make the order disobeyed, and hence that there was, in legal effect, no order.

3. Jurisdiction is the right to adjudicate concerning the subject-matter in a given case, to constitute which it is essential that the court have cognizance of the class of cases to which the one adjudged belongs; that the proper parties be before the court, and that the point decided, in substance and effect, be within the issue made by the pleadings.

4. An order that the court of chancery, in a proceeding in aid of an unsatisfied judgment at law, which contemplates the conservation, pending suit, of moneys which, by law, are exempt from application to the liquidation of the judgment debtor's obligations, or which requires an act which, if done, would contravene public policy and be void, though erroneous, is not without the court's jurisdiction.

5. When the government of the United States restored to P., a former purser in the navy, his private moneys, which his successor in office, without authority of the United States, borrowed from P. for the use of the government, but which, in fact, the successor did not apply to that use, those moneys are not clothed with any sacredness which exempts them from the creditors of P.

6. An order which forbade P. from endorsing drafts delivered to him by the United States treasury for such moneys, for a few days, pending hearing on an order to show cause why they should not be endorsed to a receiver, does not contravene public policy by delaying the fiscal operations of the government.

7. An assignment of a claim against the United States, which has been established and ascertained, in obedience to an order of the court of chancery in a proceeding in aid of an unsatisfied judgment at law, obtained and prosecuted in good faith, is not such an assignment as is forbidden and made a nullity by the three thousand four hundred and seventy-seventh section of the Revised Statutes of the United States.

8. The exercise of a court's power to punish for contempt has a twofold aspect—*first*, the proper punishment of the guilty party for his disrespect of the court or its order; and, *second*, to compel performance of some act or duty required of him by the court, which he refuses to perform. In the former case the court, having regard to the gravity of the offence, will itself determine the nature and extent of the punishment, and in the latter case the party refusing to obey should be fined and imprisoned until he performs the acts required of him or shows that it is not within his power to do so.

On motion to punish for contempt.

The bill in this cause was filed in June, 1874, in aid of an unsatisfied judgment, recovered June 2d, 1857, by Samuel Forrest, deceased, against Rodman M. Price, of the county of Bergen, in the supreme court of this state, for $17,000 debt and $78.04 costs of suit. No property out of which the judgment could be satisfied was then discovered, and the suit was suffered to lie dormant until the 8th of August, 1892, when the complainant, by her petition, represented that an *alias* writ of *fieri facias* upon the judgment had been returned unsatisfied on the 4th of August, 1892; that the judgment remained wholly unpaid; that $45,000 was about to be paid the defendant from the United States treasury in virtue of an act of congress in his behalf passed, and that he did not intend to apply such moneys towards the satisfaction of her judgment. The petition prayed, that an injunction might issue to restrain the defendant from collecting those moneys for his own use, and that a receiver might be appointed to whom the moneys might be transferred by the defendant.

Upon the presentation of the petition, an order was made on the 8th of August, 1892, which required the defendant to show cause before the chancellor, on the 12th of September then next, why an injunction should not issue and a receiver be appointed, according to the prayer of the petition, in which was incorporated this restraining clause:

"And that, in the meanwhile, the said Rodman M. Price be and he hereby is enjoined and restrained from making any endorsement of any draft or other negotiable or other paper or security which shall be made or delivered to

him by the United States of America or any officer of the treasury depart-
ment thereof, or which shall in anywise come to his possession or control from
it or such officer mediately or immediately, and which shall be expressed to
be paid to his order, and from transferring, assigning, delivering or in any
way passing the said draft or paper or security or the right thereto, or to any
money to be derived therefrom or thereby to any person whatever except
under the order of this court."

Upon the return of the order to show cause, the defendant
appeared by counsel, and, at his instance, adjournment of the
hearing was had with leave to take depositions, the restraining
clause of the order being continued in force.

After service upon him of the order to show cause, and while
its restraint remained in force, the defendant received four drafts
from the United States treasury department respectively for
$20,000, $13,500, $9,000 and $2,704.08, aggregating in amount
$45,204.08, and on the 5th day of September in the same year,
in the city of Washington, endorsed the drafts for $13,500 and
$2,704.08, and handed the former of them to his attorneys there
and drew the money upon the latter of them for his own use.
On the 3d of October in the same year, during an adjournment
of the hearing of the order to show cause, which he had obtained
after appearing and filing an answer to the petition of the com-
plainant, in the city of New York, he endorsed the two remain-
ing drafts and drew the moneys ordered by them to be paid.
By order made on the 10th of October, 1892, the chancellor,
not having yet been apprised of the endorsement and collection
of the drafts, appointed a receiver of the property and things in
action belonging or due to the defendant Price, and directed the
defendant to endorse and transfer to the receiver the drafts in
question. The drafts having been previously disposed of, the
direction of this order was, of course, not complied with.

Upon the defendant's action being duly represented to the
chancellor, on the 18th of October, an attachment was issued
against him as for contempt of court. He left the State of New
Jersey and was not served with the writ until July, 1893.
Later he was examined upon interrogatories in the matter of
contempt, and in that examination admitted, among other things,

Forrest v. Price.

that the order to show cause had been served upon him; that he had read it and handed it to his counsel ; that afterwards, on the 5th of September, 1892, in the city of Washington, he received from the assistant treasurer of the United States the four drafts already referred to, his claim having been allowed and a warrant having been duly drawn for them, each of which drafts was payable " to the order of Rodman M. Price, late purser U. S. N.," and receipted for them; that on the same day he endorsed the draft for $2,704.08, " Rodman M. Price, late purser U. S. N.," and received the money therefor; that on the same day he endorsed the draft for $13,500 and delivered it to his attorneys in Washington, in payment for services which they had rendered him in and about procuring the money from the government, and that, on the 3d of October following, he endorsed the two remaining drafts in the city of New York, and received the moneys for them.

He admits that his disregard of the restraining order was deliberate, and essays to excuse it in his answer to the thirteenth interrogatory.  To that interrogatory he, among other things, replies :

"And this defendant, in further answering in regard to his claim against the United States government herein referred to, saith that congress passed an act for the relief of Rodman M. Price, which was approved by the president, February 23d, 1891, and of which the following is a copy:

" 'An act for the relief of Rodman M. Price.

" '*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury of the United States be and he is hereby authorized and directed to adjust, upon principles of equity and justice, the accounts of Rodman M. Price, late Purser of the United States Navy and acting Navy Agent at San Francisco, California, crediting him with the sum paid over to and receipted for by his successor, A. M. Van Nostrand, acting Purser, January fourteen, eighteen hundred and fifty, and pay to said Rodman M. Price, or his heirs, out of any money in the treasury not otherwise appropriated, any sum that may be found due to him upon such adjustment.

" 'Approved February 23, 1891.'

"And under which the Secretary of the Treasury did cause to be adjusted, upon principles of equity and justice, the accounts of defendant as late officer, to wit, a purser in the navy of the United States."

Then, after stating at length the account as adjusted, by which it appears that the balance due to him was $76,204.08, he continues:

"That about the sixth of December, 1848, this defendant was assigned to duty as purser and fiscal agent of the Government for the Navy Department of the United States. On the first of January, 1850, he was relieved from duty and ordered to report to the Secretary of the Navy, in Washington, D. C.; that in pursuance of said order of recall he turned over the public moneys and property to his successor, on or about December thirty-first, 1849, and on January fourteenth, 1850, advanced to his successor, from his private funds, the sum of $75,000, to be disbursed by his successor for the benefit of the United States. Thus, a controversy arose as to whether the government of the United States was responsible for private funds which had been turned over to its officer."

He then referred to an opinion of Caleb Cushing, attorney-general of the United States, dated March 12th, 1854, in which is quoted a letter from the secretary of the navy to the defend-ant, instructing him concerning special duties then required of him, among which was the procurement of funds, for use at the station to which he was sent, by bills drawn upon the navy department in Washington, and in which the attorney-general states that Van Nostrand, who succeeded the defendant as purser, had been the defendant's clerk and was lawfully ap-pointed his successor by the commodore commanding at the California station, and also that the defendant, with another, became security to the government in a bond in the penal sum of $30,000, conditioned for Van Nostrand's faithful performance of his duties as such purser. It appears in the case, further, that Van Nostrand afterwards converted to his own use not only government moneys, but also the $75,000 which the defendant had placed in his hands. The opinion of the attorney-general concludes with the determination that as the defendant's advance of his private funds to his successor was unauthorized by the government, it could not be charged against the United States. After the rendition of the opinion the accounts of the defendant remained unadjusted until after the approval of the act of 1891, when, in obedience to that act, the advance of $75,000 to Van Nostrand, for the use of the government, was credited him, and

in August, 1892, the balance in his favor was ascertained to be and allowed at $76,204.08, or $1,204.08 more than the $75,000 advanced.   This excess appears to have been made up by allowances for mileage.   Of the balance thus found, $30,000 or thereabouts has been withheld to answer the defendant's liability on Van Nostrand's bond, and the remainder, $45,204.08, has been paid as aforesaid by the four drafts.

To properly understand the position now taken by the defendant, it is necessary to call attention to the three thousand four hundred and seventy-seventh section of the Revised Statutes of the United States, which is in this language :

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due and the issuing of a warrant for the payment thereof.   Such transfers, assignments and powers of attorney must recite the warrant for payment and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer ; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment or warrant of attorney to the person acknowledging the same."

Continuing his answer to the thirteenth interrogatory, the defendant says :

" This defendant further saith that, believing he was entitled personally to receive, under the terms of said act of February 23d, 1891, the money appropriated for his relief, and that it was his right and duty to assist in adjusting and closing his accounts according to the requirements of the government, and believing that it was not within the province or jurisdiction of the honorable chancellor of the State of New Jersey to intervene or divert from its proper channel money appropriated by the act of congress, if so intended, or to interfere between the adjustment of the accounts of this defendant as late officer of the United States navy, with the government of the United States and the payment, and without any intention of disrespect to the chancellor, this defendant did endorse his name and rank upon said drafts, being payable to Rodman M. Price, late purser in the United States navy, upon the back of said several drafts, as hereinbefore stated, which this defendant

believed he had a right to do, and which this defendant most respectfully submits was not within the jurisdiction of the honorable chancellor of the State of New Jersey to restrain or prohibit him from doing; that, unless said endorsement was made, inconvenience and annoyance and impediments would have been drawn in the way of the fiscal operations of the United States " &c.

After the interrogatories were answered, the United States government having abandoned the prosecution of Van Nostrand's bond, and the defendant Price having applied for payment of the moneys withheld to answer any recovery that might be had on the bond, the chancellor, after hearing the parties, on the 21st of December, 1893, made further order that the defendant Price do forthwith make and deliver to the secretary of the treasury of the United States his written consent and request that the sum remaining unpaid to him be paid to the receiver, and, among other rights and properties, to assign such receiver all his right, title and interest in those moneys.   This order the defendant also refuses to obey, and, in justification of such refusal, offers the record of a proceeding instituted by the receiver appointed herein, in the supreme court of the District of Columbia, to aid him in reaching the $30,000 remaining in the United States treasury, by which it appears that the receiver has obtained an injunction in that court against him, which forbids him from assigning any warrants or drafts for the whole or part of said moneys.

Motion is now made to punish the defendant for contempt in his disobedience of the three orders of the court above specified, to wit, the order of August 8th, 1892, which forbade the endorsement of the four drafts, the order of October 10th, 1892, which directed the transfer of the drafts to the receiver, and the order of December 21st, 1893, which required the defendant to request and consent to the payment of the $30,000 to the receiver and to assign those moneys to the receiver.

*Messrs. Cortlandt & R. Wayne Parker,* for the complainant.

*Mr. Joseph D. Bedle,* for the defendant Rodman M. Price.

Forrest v. Price.

THE CHANCELLOR.

The proceeding in which the orders contemned were made is designed to quickly discover and secure assets of a judgment debtor which cannot be reached by execution, and among them moneys due to the judgment debtor from another or others. When it is made to appear that there are such moneys, the statute expressly authorizes the court of chancery to restrain the debtor from transferring them and to require him to assign and deliver them to a receiver. *Rev. p. 121.*

It is not controverted that when the court took action in the present matter, by the orders in question, the defendant Price had become entitled to moneys from the United States government. The act of congress had established his claim and the proper accounting officers had ascertained it. It remained only for the defendant to receipt for the moneys and obtain possession of them. They were in substance his property. *Goreley* v. *Butler, 147 Mass. 8, 10; affirmed by the United States Supreme Court, 146 U. S. 303.*

It was after the sum due to defendant was ascertained that the court, by its order, forbade the defendant to endorse or transfer any drafts that might be delivered to him in payment of his property, and to assign to its receiver all moneys that remained undrawn from the United States treasury.

It is no excuse in a proceeding for contempt that the orders contemned are erroneous in law. The method of correcting such error is by appeal, not by disobedience. When a person is proceeded against for disobedience to an order or judgment, he cannot allege in defence that the court erred in that order or judgment. To be successful he must go further and make out that there was, in legal effect, no order, by showing that the court had no right to judge between the parties upon the subject. *People* v. *Sturtevant, 9 N. Y. 263, 266; Una* v. *Dodd, 12 Stew. Eq. 173, 180; S. C. on appeal, 13 Stew. Eq. 672, 706.* Recognizing this well-established principle, the defendant denies the jurisdiction of the court to make the orders here in question, upon three grounds—*first*, because the fund is a governmental bounty to him, designed for his personal maintenance and com-

fort, and therefore is not liable to application to the satisfaction of the judgment of the complainant, however meritorious it may be; *second,* because the restraint of the endorsement of the governmental drafts tended to interfere with and delay the fiscal operations of the government; and, *third,* because the assignment of the moneys to a receiver, as contemplated by the orders of October 10th, 1892, and December 21st, 1893, would contravene the letter and policy of the law enacted in the three thousand four hundred and seventy-seventh section of the Revised Statutes of the United States and be a nullity.

In *Munday* v. *Vail, 5 Vr. 418, 422,* Chief-Justice Beasley defined jurisdiction to be the right to adjudicate the subject-matter in a given case, to constitute which it is essential that the court must have cognizance of the class of cases to which the one adjudged belongs; that the proper parties shall be before the court, and that the point decided must, in substance and effect, be within the issue made by the pleadings. Testing the present case by the definition thus given, we first ascertain that its subject-matter is the application of the defendant's established and ascertained property in possession of the United States to the satisfaction of the complainant's judgment. That this court has cognizance of this class of cases is not disputed. The defendant is regularly before the court, and the points to be decided are clearly within the issues presented by the pleadings. To urge that the particular money in question is exempt from the application desired, is to present a defence upon the merits of the case, and to object that the temporary restraint of the endorsement of drafts will hinder and delay the fiscal operations of the United States, is to offer a reason why the court should not continue its temporary restraint, and so the insistment that, under the section of the United States Revised Statutes which has been referred to, the assignment to a receiver would be a nullity, may be a reason why the court should not order it to be made. None of these matters, however, go to the court's jurisdiction—they are defences properly belonging in the cause which the court has power to adjudicate upon. If the court err in that adjudication, the remedy is by appeal.

Confusion is avoided by bearing in mind that this suit is not a proceeding against the United States nor directly against a fund in its possession, but a proceeding *in personam* against the defendant Price.

But, assuming that the contentions of the defendant properly question the court's jurisdiction, let us examine their merits.

No tenable ground upon which the first can be rested has been suggested in behalf of the defendant. His connection with the United States navy was severed some forty or more years ago. It does not appear that he now owes the government any duty, for which this fund is designed to maintain him. The case bears no resemblance to the unearned half pay of a retired officer, which is protected because of the service he may be called upon to render. *Schwenk* v. *Wyckoff, 1 Dick. Ch. Rep. 560.* I apprehend that a claim actually established, so that it now is property of the claimant, even though it spring from pure bounty, is not, in absence of express legislative provision to the contrary, exempt from the claimant's debts. The act for the relief of the defendant does not intimate that the provision it makes is a sacred bounty.

But it affirmatively appears that the money, of which the statute authorizes payment, though not a legal claim, is not pure governmental bounty.

The provision in the act for the relief of the defendant Price, that payment should be made to him " or his heirs," has been urged as indicative of the legislative intention that the payment was not intended to benefit creditors. I do not so understand the act. The expression " or his heirs " was undoubtedly a provision against his death before the day of payment, and there can be no substantial doubt that it is used in the sense of personal representatives, the thing dealt with being personalty, and appears in the act to secure the moneys to his estate in the event of his death before they are paid.

The direction of the statute is to credit the defendant with a sum of money which he, many years ago, loaned to an officer and agent of the government for the use of the United States, and which that officer received in his official capacity for the

purposes of the government. That officer was the successor of the defendant in a mission in which the defendant had been specially charged with the duty of going into a new and unsettled country, at a time when the inhabitants, as history records, had become mad in speculations, to establish a credit for the government. The method of establishing that credit, it is true, was prescribed, but it was difficult to literally follow the requirements of the prescription. Exigencies demanded that moneys should be had. Of necessity, the government officials, five thousand miles, in course of usual travel, from home, were obliged to exercise some discretion. It was in this situation that the defendant Price advanced to his successor $75,000 of his private moneys for the use of the United States. The receipt of such a loan for the government was beyond the scope of that successor's authority, and the moneys never having, in fact, been applied to the use of the government, the receipt of them was not ratified or recognized, and hence the defendant was subjected to a loss.

After many years, congress reviewed the transaction, and, recognizing in it a moral obligation upon the United States, directed that credit be made to the defendant for the amount of his advance. The environments of the whole situation, when the loan to Van Nostrand was made, evinced to congress an appropriateness in the transaction and admitted of the advance being made in good faith, for the benefit and convenience of the United States. That it was made in good faith does not appear to have been doubted. The congressional proceedings show that it was upon consideration of these facts that the burden of the loss, without interest, was thrown by congress upon the public treasury. The statute was designed to restore to the defendant his property, which, in good faith, he had entrusted to an officer of the United States for the benefit of his principal.

I do not find in this situation even the bounty of a grateful government, partaking of the character of a pension or reward for a meritorious deed, but simply the restitution of property which had once belonged to the defendant, as assets for the liquidation of his pecuniary obligations; and I fail to under-

Forrest *v.* Price.

stand how, upon its restoration to the defendant, it can be held to assume a new character.

Upon the second insistment, it is not perceived how the restraint of the endorsements of any drafts which should be delivered to the defendant pending the return day of the order to show cause, dated August 8th, 1892, would have materially interfered with the fiscal operations of the government. The restraint operated upon the defendant, not upon the government. It substantially forbade him to draw the money upon the drafts, leaving the government to pursue such course in the event of his failure to draw, that its regulations or practice permitted. Besides, the restraint was limited to a short day, when the defendant would be heard upon the question whether a receiver should be appointed. That delay, in point of fact, proved to be exactly one week from the delivery of the drafts. It has not been suggested how such a delay could operate prejudicially to the public service. I am not referred to any law, rules, regulations or policy of the governmental departments which show that such a delay, or kindred delays, can so operate. That it did not infringe governmental regulations amply appears by the fact that two of the four drafts were not endorsed and presented by the defendant for payment until the 3d of October, and were then paid, so far as appears, without objection.

It is unnecessary, under this state of facts, to discuss the question whether this court would have power to make an order which would directly or indirectly inconvenience and impede the fiscal operations of the United States. The order in question does not appear to have been of that character.

The third insistment of the defendant that an assignment of moneys in the United States treasury, as directed by the orders of October 10th, 1892, and December 21st, 1893, to the receiver, would contravene the policy of the law of the United States, and that, therefore, the orders were not within the jurisdiction of this court, remains to be considered. Upon this insistment the greatest stress had been laid. It is to be observed that the section of the Revised Statutes which is referred to declares that all assignments of claims upon the United States shall be abso-

lutely null and void unless they are freely made after the allowance of the claim, the ascertainment of the amount due and the issuance of a warrant for its payment. This section was taken from a statute of 1853, which was entitled "An act to prevent frauds upon the treasury of the United States." The purpose of congress, in its enactment, inferentially was to protect the government from the necessity of dealing with those who were not directly and originally concerned in the claim—that is, with strangers to it whose numbers and possibly merely speculative interests in it might embarrass its speedy and just allowance or denial. *Spofford* v. *Kirk, 97 U. S. 484; Goodman* v. *Niblack, 102 U. S. 556; Bailey* v. *United States, 109 U. S. 432; Freedman's Savings and Trust Co.* v. *Shepherd, 127 U. S. 494.*

Viewed in the light of a protection to the government, it has been held that the statute is not to be interpreted according to the literal acceptation of the words it uses. In the case of *Erwin* v. *United States, 97 U. S. 392,* it was ruled that the statute applied to cases of voluntary assignments of demands against the government and did not embrace cases where the title was transferred by operation of law, such as the passing of claims to heirs, devisees or assignees in bankruptcy, and, upon the same reasoning, in *Goodman* v. *Niblack, supra,* it was adjudged that it did not extend to a voluntary assignment for the benefit of creditors, and in *Bailey* v. *United States, supra,* it was held that the officers of the government might safely pay according to an unrevoked power of attorney if they saw fit to do so. So a partnership agreement to carry out a governmental contract, held by one of the partners, which subjected the moneys earned from the government under the contract to the rights of other partners, was not regarded as within the policy of the act. *Hobbs* v. *McLean, 117 U. S. 567.*

It is not perceived that the assignment and consent to payment to the receiver in the present case differs in principle from an assignment to an assignee in bankruptcy, or to an assignee under a voluntary assignment for the benefit of creditors. The reason underlying the adjudications which exclude those cases from the operation of the statute is stated by Mr. Justice Miller,

Forrest *v.* Price.

in *Goodman* v. *Niblack,* in this language, " that there can be no purpose in such cases to harass the government by multiplying the number of persons with whom it has to deal, nor any danger of enlisting improper influences in advocacy of the claim ; that in such cases the exigencies of the party who held the claim justified and required the transfer that was made."

This reasoning is not a whit less pertinent in its application to .the present receivership than in its application to either of the assignees adjudicated upon. The receiver here is actuated, in the performance of his trust, by the identical motives and desires which actuate assignees in bankruptcy and under voluntary assignments for creditors.

I am therefore of opinion that the assignment which was required from the defendant Price was not within the inhibition of the United States law.

In reviewing the disobedience of the defendant, I am strongly impressed that the objections now interposed are mere subterfuges urged to secure his escape from punishment for a deliberate defiance of the court's authority.

It is remembered that, when the order of August 8th, 1892, forbidding the endorsement of drafts, was first served upon the defendant, the drafts were not in his possession, and that, with the plain command of that order before him, he went to Washington and there obtained the drafts, and upon the same day, although it was only a week before the time fixed for hearing in this court, he deliberately endorsed two of the drafts. Then holding the two remaining drafts until after he had procured an adjournment of the hearing upon the order to show cause, upon terms which continued the restraint upon him, he endorsed those two remaining drafts, obtained the money upon them and departed from the state so that the court's process could not be served upon him, and practically remained without the reach of that process for fully nine months. Furthermore, after he was served with the writ of attachment and examined upon interrogatories, he refused to assign to the receiver or to consent to the receiver's having the moneys remaining in the United States treasury. These circumstances, with other surroundings of his

Forrest v. Price.

disobedience, convince me that his intention was not to surrender his moneys to the court's receiver, and if, in carrying out that intention, it was necessary to disobey the court's order, he would do so. Such intention carried into effect is, without question, a punishable contempt. *State* v. *Trumbull, 1 South. 157; Fraas* v. *Barlement, 10 C. E. Gr. 84; Una* v. *Dodd, 13 Stew. Eq. 672, 719.* The exercise of the court's power to punish has a twofold aspect—*first*, the proper punishment of the guilty party for his disrespect of the court or its order, and *second*, to compel performance of some act or duty required of him by the court, which he refuses to perform. *In re Chiles, 22 Wall. 157; Stimpson* v. *Putnam, 41 Vt. 238.* In the former case, the court, having regard to the gravity of the offence, must itself determine the nature and extent of the punishment, and in the latter case, the party refusing to obey should be fined and imprisoned until he performs the acts required of him, or shows that it is not in his power to do so. Our Chancery act (*Rev. p. 123 § 103*) is in harmony with this general principle. It provides that where a person shall be adjudged to be in contempt, before he is released or discharged, he shall pay to the clerk in chancery, for the use of the state, a sum not exceeding $50 as a fine for the contempt, and, being in court on process of contempt or otherwise, shall stand committed and remain in close custody until the court's order shall be obeyed and until the fine imposed, with the costs, be fully paid. By infraction of the court's order of August 8th, 1892, the defendant has possessed himself of $31,704.08 in moneys. It is within his power to make amends for his disobedience to the extent of paying those moneys to the receiver appointed herein. It is also within his power to obey the order of December 21st, 1893, but I assume it is not within his power to restore the draft for $13,500 or the moneys which it called for. I do not forget the injunction of the supreme court of the District of Columbia. It does not forbid the defendant to request the United States authorities to pay the moneys to the receiver and to assent to such payment. Such an act may be of great value to the receiver, for it will fully protect the treasury officials (*Bailey* v. *United States, supra*), and when the object of

West Jersey Railroad Co. *v.* Camden &c. Railway Co.

the injunction is considered it is conspicuous that its intent and meaning is not to prevent an assignment to the receiver, but, on the contrary, to protect him from assignments which may render it impossible for him hereafter to secure the money.

I will make this disposition of this matter: I will fine the defendant Rodman M. Price, for his contempt, the sum of $50, to be paid to the clerk in chancery for the use of the state, and will order him to pay the $31,704.08 above mentioned, within five days from the service upon him of a copy of the order or decree hereon, and order that unless the fine be paid to the clerk, and the said moneys be paid to the receiver, and the directions of the order of December 21st, 1893, be specifically complied with, and the costs of these proceedings in contempt be paid within five days from the service of such order, that the defendant shall be committed to the common jail of the county of Bergen, there to remain in close custody until he shall make said payments and comply with said order of the 21st of December, 1893, unless the court shall deem it proper, for good reason shown, to sooner discharge him.