Price v. Forrest.

---

Rodman M. Price et al., appellants,

*v.*

Anna M. Forrest, administratrix of Samuel Forrest, deceased, et al., respondents.

1. A statute of the United States which authorizes and directs the secretary of the treasury of the United States to adjust the accounts of a former purser in the navy, upon principles of equity and justice, and credit him with a sum of money paid over to and receipted for by his successor in office, although such payment was without governmental authority, and directing the payment of the sum that may be found due him, upon such adjustment, to him "or his

heirs," is not a statute which bestows a mere gratuity or bounty, but it is the restitution of property which once belonged to him as assets for the liquidation of his pecuniary obligations, and upon its restoration it cannot be held to have assumed any new character.   The words " or his heirs " are simply words of succession and descriptive of his estate in the money found to be due him, and used in the statute in the sense of personal representatives, and intended to secure the moneys to his estate, in the event of his death before they were paid.

2. The assignment of a claim against the United States, ordered by the court of chancery to be made by a debtor, or his representatives, if he be deceased, to a receiver in aid of proceedings in said court by a creditor, to obtain satisfaction of a judgment at law recovered against the debtor, is not prohibited by and is not a nullity under the provisions of section 3477 of the revised statutes of the United States.

3. Such an assignment to the receiver or an assignment to him by operation of law in such proceedings, by virtue of his appointment as receiver, vesting in him, under the powers with which he is clothed, the right to take, receive, sue for and distribute according to law, and the orders of the court from which he derives his appointment, is an exception to the provisions of section 3477 of the revised statutes of the United States, requiring assignments of such claims, or powers of attorney to receive the same, to be acknowledged by the persons executing them, and to be certified by the officer taking such acknowledgments.

4. The objects of section 3477 of the revised statutes of the United States are that the government may not be harassed by multiplying the number of persons with whom it has to deal, and that it might always know with whom it was dealing, until a contract is completed and an adjustment and settlement made ; and none of these evils can happen upon an assignment for the benefit of the creditors of a claimant, either expressly ordered to be made by a court having jurisdiction or resulting by operation of law.

5. The court of chancery has jurisdiction to determine the right of the distribution of such claim in payment and satisfaction of a judgment debt due from the claimant to his creditors, whenever the proper parties are before the court and the point decided be within the issues made by the pleadings.

———

On appeal from the order of the chancellor, overruling the pleas of the appellants.

The bill of complaint in this case is filed by Anna M. Forrest, administratrix of Samuel Forrest, deceased, and Charles Borcherling, receiver of the goods and chattels, rights, credits, property and effects of Rodman M. Price, deceased, against Rodman M. Price and others, the children of the said Rodman

Price v. Forrest.

M. Price, deceased, as defendants. To this bill of complaint, two joint and several pleas have been filed, alike in form and substance, setting up in each precisely the same defence to this suit in equity.

This bill of complaint was filed July 5th, 1894.

It states that it is filed, by permission of the court, as a bill of revivor and original bill, in the nature of a supplement to a' bill which was filed on the 30th day of May, 1874, by the complainant, against Rodman M. Price, of Bergen county, in the State of New Jersey, now deceased, jointly with his wife, Matilda C. S. Price, and Francis Price. It is alleged that by such former bill of complaint it was set forth that on the 2d day of June, A. D. 1857, in the supreme court of New Jersey, the said Samuel Forrest, in his lifetime, recovered a judgment against Rodman M. Price, now deceased, for the sum of $17,000 debt, and $78.04 costs of action, and that upon said judgment a *fieri facias* was sued out and returned unpaid and unsatisfied; that on November 7th, 1860, the said Forrest died intestate, with the said judgment still remaining unpaid and unsatisfied; that on or about January 2d, 1874, administration of the goods and chattels, rights and credits which were of the said Forrest, deceased, was granted to the said Anna M. Forrest by the ordinary of the State of New Jersey; that shortly afterwards said judgment was revived by a writ of *scire facias,* and that on or about April 14th, 1874, another writ of *fieri facias* was duly and regularly issued upon said revived judgment, which also was returned unpaid and unsatisfied, and that thereupon the former bill of complaint by said Anna M. Forrest, as administratrix aforesaid, was filed, alleging that the said Rodman M. Price, since deceased, was possessed of certain moneys, property and things in action, either in his own possession or held in trust for him by the other defendants, and praying for the appointment of a receiver of such property and things in action, and that the same be appropriated to the payment of the judgment aforesaid and costs thereof, therein set forth, with the appropriate prayer for injunction and process.

The bill of complaint in this case further states that on or

about December 4th, 1874, the defendants in said former bill filed their answer thereto, in which the recovery and force of the judgment against Rodman M. Price, at the suit of said Forrest, was admitted, but denying, circumstantially, that the said Rodman M. Price was possessed of any of the property as claimed in such bill of complaint, or that any property whatever was held by him, or in trust for him, by the other defendants, and charging that the said Price had no title to or interest in any of the property then standing in the names of the other defendants. The bill further states that after the filing of this answer the cause slept until August 9th, 1892, when the said Anna M. Forrest, administratrix aforesaid, and one of the complainants in this cause, filed a petition supplementary to the bill, reciting that several writs of *fieri facias de bonis et terris* had been issued upon the judgment aforesaid, all of which had been returned unsatisfied for want of any goods or lands whereof to make a levy out of which to make the debt and costs.   By this petition, as it appears by the bill of complaint, it was charged that the sum of $45,000 was about to be paid to the said Price by the officers of the treasury of the United States, being the sum found to be due him by an accounting between the said Price and the government of the United States, and that such sum was to be paid by the delivery to Price, or his attorney, of a draft of the treasurer of the United States or some other negotiable security, made and issued by the financial officers of the government of the United States, payable to the order of said Price, and that said draft or other negotiable security was to be made, and the transaction closed upon the 15th of the then month of August. By this petition, it was charged that said Price, if he received such money, would put the same beyond the reach of his creditors, and that the same would not be available to satisfy said judgment, and she, therefore, prayed that an injunction might issue to prevent said Price from endorsing such drafts to anyone but the complainant in payment of said judgment, and that a receiver of such fund or draft or negotiable security be appointed, and that said Price be directed, immediately upon the receipt of the same by him, to endorse the same to said receiver, to the end that the amount

thereof might be taken by such receiver as an officer of the court of chancery, to be disposed of according to law and the direction of that court. The bill further recites that upon such petition being filed on August 8th, 1892, an order to show cause on that day was made, why the prayer of the petition should not be granted, and why an injunction should not issue and a receiver be appointed according to the tenor of the prayer of said petition, and further directed that the said Price be restrained and enjoined from making any endorsement of any such draft, drafts or other negotiable security of the United States as was set forth in said petition. This order was made returnable on September 12th, 1892.

The bill of revivor further states that a certified copy of such order, under the seal of the court of chancery, was served on August 10th, 1892, on the said Price, yet on the 5th day of September, 1892, he received from the assistant treasurer of the United States, four several drafts—one for the sum of $2,704.08, one for $13,500, one for $20,000, and a fourth for $9,000—and that on different dates between the date of the reception by him of the drafts and the 3d day of October, 1892, he endorsed such drafts and collected the proceeds thereof and devoted the same to his own use, and that on the 3d day of October he filed an answer to the petition, which, without admitting the endorsement of said drafts, alleged that the judgment of Forrest against him had been paid, and further, that there was a sum of money due him from the United States, voted to him or his heirs by congress, and that about $45,000 of it was paid or about to be paid, but that even if the said judgment was still unpaid and valid against him, yet this sum of money so voted to him was not amenable to the payment of such judgment, and could not be lawfully paid to any receiver or otherwise appropriated to that purpose.

The bill further alleges that such proceedings were had upon the former bill and the petition aforesaid, that after the hearing on said order to show cause, on October 10th, 1892, Charles Borcherling was duly appointed receiver of the property and things in action belonging to, or due to, or held in trust for said Price

at the time of the issuing of the executions on such judgment or at any time afterwards, and especially of the four drafts aforesaid, with authority to the receiver to possess, receive, and, in his own name, to sue for such property and things in action, and to hold such drafts subject to the further order of the court; that such receiver was required to give bonds, in the sum of $40,000, for the faithful performance of his duties, and that in and by said order the said Price was enjoined and restrained from intermeddling with said receiver in regard to said drafts, and to put the same in the possession of the receiver, if the same were in the possession of said Price or under his control, provided that if said drafts, excepting the one for $13,500, should be delivered, with the endorsement of said Price, to the clerk of the court of chancery, on or before October 13th, then the order should be void. He was also enjoined and restrained from any endorsement or appropriation of said drafts otherwise than to said receiver or to the clerk as aforesaid. The receiver gave the bond required, and filed his official oath and entered upon his duties. The drafts were not so delivered by Price, whereby the order remained in full force. This order was served upon Price, with a written demand that if the drafts or either of them were not in his physical possession, but were held by him or subject to his control, whether alone or jointly with any other person, that he give his consent and order in writing for their delivery to the receiver or to his order, and that he do all things necessary within his power to put the receiver in possession and control thereof. The copy of the order and the demand were served upon Price shortly after the order was made, elsewhere than in the State of New Jersey, which was the place of his abode and residence, for the reason that he was not to be found within that state until May 28th, 1894, when it was served upon him again. On the 16th day of January, 1893, an attachment was issued against Price for contempt of court, in disobeying the order of August 8th, 1892, and after due proceedings he was convicted of such contempt, and, by order dated May 18th, 1894, he was ordered to pay to the receiver the sum of over $30,000 of this fund aforesaid, together with a small fine, and that, upon failure

to comply with such order, he be imprisoned until said order was performed.

The bill further alleges that the amount of such drafts was a part of a certain debt of $76,000 or thereabouts awarded to the said Rodman M. Price by the officers of the treasury department of the United States, under an act of congress passed February 23d, 1891, and agreed to be paid to him in conformity with the directions contained in such act; and that the balance of said $76,000, after the drafts were delivered to Price, was to be retained to answer a counterclaim of the United States for a debt alleged to be due by Price to the United States, but after investigation such determination to retain such balance was reconsidered, and that the treasury department were about to pay unto the said Price the sum of $31,000, the balance of said fund, and that said Price and his agents were actively seeking to obtain payment of the same; and that pending the proceedings to compel the said Price to consent that the treasurer of the United States pay to said receiver such balance, the said Price, on the 8th day of June, 1894, departed this life intestate, and that no letters of administration have ever been granted to anyone upon his estate.

The bill further alleges a further payment of $9,000 was made out of said fund to said Price, thus reducing the balance of said fund apparent on the books of the treasury department of the United States to the sum of about $22,000, and that demand had been made by the receiver upon the treasurer of the United States for the payment to him of said balance; that the treasurer neither consents nor refuses to make such payment, but is willing to abide the determination of some lawful tribunal of the rights of the receiver in the premises, and is willing to pay over the balance of such fund in accordance with such determination; and it is believed by the complainants that on the decree of the court of chancery being made that the receiver is entitled to said balance, and notice thereof duly given, that the treasury department will respect such decree and pay over to the receiver the balance of said fund.

The bill further alleges that the children of said Price, as his

heirs-at-law, are endeavoring, upon their construction of the provisions of the act of 1891, to obtain the payment of this balance to them personally, on the ground that under the act of congress awarding this amount to Price or "his heirs," the money belongs to them as his heirs-at-law and not as representatives of his estate, and that the receiver has no right in law thereto, and that they have authorized John C. Fay, of Washington City, by power of attorney, to apply for and receive such balance in their behalf, and that they are now pressing their claim as aforesaid with the secretary of the treasury for such payment. Administration *ad prosequendum* of the estate of Price has been granted to Allan L. McDermott, the clerk of the court of chancery, who is joined as a defendant simply for the purpose of this suit, to subject this fund to the payment of the debts of the intestate.

Prayer is made that injunction issue against the defendants receiving any moneys of the officers of the treasury of the United States, that the defendants be decreed to pay to the receiver any part of said money which they respectively have received or hereafter may receive.

The defendants have not answered this bill, but have filed two pleas thereto, one the joint and several plea of Madeline Price and Governeur Price, children of Rodman M. Price, deceased; the other is the joint and several plea of Francis Price, Rodman M. Price and Trenchard Price, other children of Rodman M. Price, deceased, and Matilda Price, his widow. These pleas are alike in form and substance. The act of congress, approved February 23d, 1891, is set out, and under it these defendants, as the heirs-at-law of Rodman M. Price, deceased, contend that they are entitled to the balance of this fund.

The facts set out by the defendants in these pleas are, substantially, that the said Rodman M. Price had no real or personal estate or property at the time of his death, and that they have not had nor do they now have the possession, ownership or control of any personal estate from their said father, and that they have not received any moneys from the government of the United States through their said father or otherwise, under the act of congress of February 23d, 1891.

Price *v.* Forrest.

The pleas set out the act of congress as follows, to wit:

"An Act for the Relief of Rodman M. Price.

"Be it enacted, by the senate and house of representatives of the United States of America in congress assembled, That the secretary of the treasury of the United States be and he is hereby authorized and directed to adjust upon principles of equity and justice the accounts of Rodman M. Price, late purser in the United States navy, and acting navy agent at San Francisco, California, crediting him with the sum paid over to and receipted for by his successor, A. M. Van Nostrand, acting purser, January fourteenth, eighteen hundred and fifty, and pay to said Rodman M. Price, or his heirs, out of any money in the treasury not otherwise appropriated, any sum that may be found due to him upon such adjustment.

"Approved February 23d, 1891."

The pleas further set forth that on or about the 6th day of December, 1848, in the early settlement and development of California, the said Rodman M. Price, deceased, was assigned to duty upon the Pacific coast at California, as purser and fiscal agent of the government of the United States, for the navy department of the United States, he then being a purser in the United States navy, and acting as such up to about December, 1849, or January, 1850, when he was detached by the government of the United States from such duty and ordered to transfer all public money and public property remaining in his hands, to his successor or to such other disbursing officer of the navy as might be designated by the commanding officer of the naval station of California, and immediately after transfer to report to the city of Washington for the purpose of settling his accounts. Afterwards, in the month of December, 1849, A. M. Van Nostrand, referred to in the said act of congress, became the successor of the said Rodman M. Price, deceased, in California aforesaid, as acting purser in the navy of the United States. Afterwards, on or about the 31st day of December, 1849, Commodore Jones, of the United States navy, commanding the United States squadron at San Francisco, California, on behalf of the government of the United States, directed Acting Purser Van Nostrand aforesaid to call on Purser R. M. Price aforesaid, and receive from him all books, papers, office furniture and funds and anything belonging to the purser's department at San Francisco.    In

accordance therewith and with the instruction aforesaid to the said Purser Price, he paid over on the 31st day of December, 1849, to the said Van Nostrand, acting purser of the United States navy at San Francisco station, in California, the sum of $45,000, being all the public moneys of the United States in the hands of said Purser Price.    Afterward, on the 14th day of January, 1850, the said Rodman M. Price, out of his private moneys alone, and not of the government of the United States, advanced to the said Van Nostrand $75,000, and took his receipt therefor as follows :

"SAN FRANCISCO, January 14, 1850.

"Received from Rodman M. Price, purser U. S. navy, $75,000 for which I hold myself responsible to the United States treasury department.

"$75,000.         (Duplicate)            A. M. VAN NOSTRAND,
                                                    "Acting Purser."

Which advance was without the approval and signature of said Commodore Jones, commanding officer of the said acting purser, A. M. Van Nostrand, although the said Rodman M. Price regarded the advance as an accommodation to and made for the benefit of the government of the United States, to be used by the said Van Nostrand, as acting purser of the United States navy, for the payment of the expenses of the navy at that station. The pleas fully exhibit the difficulties and embarrassments of the United States in obtaining funds for these purposes on the Pacific coast at this period of the history of California.    The said A. M. Van Nostrand never returned or paid the said sum of money, or any part thereof, to the said Rodman M. Price; neither did he account for this sum to the government of the United States.

In the settlement of the accounts of the said Rodman M. Price he made claim on the treasury department for a credit or allowance for the said sum of $75,000, and has continued ever since to make such claim.    In the year 1854 the then attorney-general of the United States, acting under instructions from the secretary of the navy to investigate the claim of said Rodman M. Price for the reimbursement or payment to him of said $75,000, gave an opinion that the government of the United

States was not responsible for and could not be charged with the private fund paid by Rodman M. Price aforesaid to the said Van Nostrand, and which was so paid without the written approval of the said commanding officer, Commodore Jones. Annexed to the pleas is a copy of this opinion, with all other proceedings taken in this matter of the claim of the said Rodman M. Price against the government of the United States, by which it is shown that the said sum of $75,000 was paid and advanced by the said Rodman M. Price in the belief that it would be an accommodation to the government in the condition of things that existed in the history of California at that time, and that the same was advanced and paid to his successor in office, in good faith, for the use of the government of the United States and the United States navy, and that apart from the lawfulness of the claim it was one equitable and just to be allowed in the settlement of his accounts. The pleas further allege that in accordance with the said act of congress the secretary of the treasury of the United States, in August, 1892, adjusted these accounts of the said Rodman M. Price, as late purser in the United States navy and acting navy agent in San Francisco, California, in accordance with the act of 1891, and credited him with the said sum of $75,000 paid over as aforesaid and receipted for by his successor, A. M. Van Nostrand, acting purser, January 14th, 1850, leaving the sum of $76,204.08 found due him, and admits that he received four drafts from the government of the United States and the money therefor, amounting to $45,204.08; and that the balance thereof of $31,000, which was part of the said $75,000, after deducting any other sum actually paid to the said Rodman M. Price thereon, in his lifetime, by the government of the United States, the defendants in said pleas named claim that they are entitled to payment thereof to them under and by virtue of the said act of congress and the adjustment aforesaid.

Argument was had before the chancellor on the bill and pleas, and on July 29th, 1895, by order of the chancellor, the pleas were overruled, with costs, from which order an appeal has been taken to this court.

*Mr. J. Flavel McGee,* for the appellants.

*Mr. Cortlandt Parker,* for the respondents.

The opinion of the court was delivered by

LIPPINCOTT, J.

The first insistment of the defendants below, and appellants in this court, is that as heirs-at-law of Rodman M. Price, deceased, they are entitled, under the act of congress of 1891, to the balance of the moneys in the treasury of the United States, amounting to about $22,000, as admitted by the pleas in this suit; that congress, by this act, was bestowing a gratuity and was at liberty to select its beneficiaries, and that in so doing it directed certain specific persons to whom it should go, and that by the directions of this statute, in his lifetime, it was a gratuity to Price, and, in case of his death before payment, then with the same qualities the gift devolved upon the persons who, at the time of his death, were his heirs.

The facts set forth in the pleas, giving rise to the act of congress, effectually dispose of this insistment, and, in the consideration of the pleas, the act must be construed to some extent with reference to those facts, especially so far as there may exist in the statute any reference to them.

The facts in these pleas exhibit a great pertinacity on the part of Mr. Price, continued through a lifetime almost, in pressing his claim for money believed by him to be due from the government of the United States. They were moneys which, indisputably, were paid out for the benefit of the United States, so admitted upon all sides and in all proceedings, but which, because of the want of the technical approval of his superior officer before the advance was made by him, became unallowable in the adjustment and settlement of his accounts with the government, but the justice of which, as a due to him, was distinctly recognized in the act of congress directing its adjustment and payment, either in whole or in part, upon principles of equity and justice.

The act of congress directs the secretary of the treasury

"to adjust, upon principles of equity and justice, the accounts of Rodman M. Price, late purser in the United States navy, and acting navy agent at San Francisco, crediting him with the sum paid over to and receipted for by his successor, January 14, 1850, and to pay to said Rodman M. Price or his heirs, out of any money in the treasury not otherwise appropriated, any sum that may be found due to him upon such adjustment."

It was upon these "principles of equity and justice" that the secretary of the treasury of the United States adjusted his accounts as an officer of the United States having accounts with the government.

A reading of this statute at once indicates that congress was not dealing with one upon whom a mere gift for honorable services was to be conferred. It was dealing with a claim of one who had expended his private moneys for the benefit of the government in an emergency which demanded or justified this expenditure. Under this act, couched in the language in which it is, it cannot, as it seems to me, be contended that the government of the United States was conferring upon Price a bounty. It was restitution to him of moneys which he had advanced, and which he believed, at the time the advance was made, would be at once repaid, in the settlement of his accounts as a disbursing officer of the United States navy. I think that the act of 1891 was based upon the idea that the claim was a moral and equitable obligation, if not a legal one, on the part of the government, for money "found to be due him," upon an adjustment of his accounts, according to principles of "equity and justice," and not upon any considerations that a gift or gratuity was being conferred upon him.

The learned chancellor, in his opinion in *Forrest* v. *Price, 7 Dick. Ch. Rep. 16, 26*, after reviewing the facts in that case, which are precisely the same in substance as those set forth in the pleas herein, says: "I do not find in this situation even the bounty of a grateful government partaking of the character of a pension or reward for a meritorious deed, but simply the restitution of property which had once belonged to the defendant as assets for the liquidation of his pecuniary obligations; and I fail to under-

stand how, upon its restoration to the defendant, it can be held to assume a new character." In that case this question was elaborately discussed by the chancellor, and his views of the nature of the obligation of the government of the United States, which was the foundation of this statute, can be fully approved.

So far as the devolution of this money is concerned, upon the facts set up in the pleas and the situation as there expressed, the statute of 1891 cannot well bear any other construction than that the payment was intended to benefit the estate of Price, and to be within the reach of his creditors. The heirs of Price were in no sense personally intended to be the beneficiaries of the United States by way of gift or gratuity to them as such. The language of the act could only be fulfilled by a payment to Price. If it could be called a gift it occurred at the passage of the act, and the act in no sense intended that the heirs of Price were to be included in the gratuity. But the reason of the act is such as to reveal the intention of congress to recognize an obligation on the part of the government, and upon its ascertainment to pay it to Price or his representatives in the same manner as a debt is paid to anyone. In his accounts with the government upon such ascertainment, he was credited with the amount found to be due. The act in its terms speaks of the application of the principles of equity and justice in the adjustment of his accounts as "late purser of the United States navy and acting naval agent at San Francisco." The meaning of this statute is to be gathered from the construction of the whole statute in view of the circumstances which led to its enactment and the object to be accomplished.

The chancellor, in his opinion in the case in 7 Dick. Ch. Rep. 16, to which reference has been made, says : "But it affirmatively appears that the money of which the statute authorizes payment, though not a legal claim, is not a pure governmental bounty. The provision in the act for the relief of the defendant Price, that payment should be made to him or his heirs, has been urged as indicative of the legislative intention that the payment was not intended to benefit creditors. I do not so understand the act. The expression 'or his heirs' was undoubtedly a provision

against death before the day of payment, and there can be no substantial doubt that it is used in the sense of personal representatives, the thing dealt with being personalty, and appears in the act to secure the moneys to his estate in the event of his death before they are paid."

The same holding was made by the comptroller of the United States in his written opinion on this question, of date of July 11th, 1894, in the determination that the word " or " in the words " or his heirs " should be construed to mean " and." Whilst this is the fair interpretation of this statute, taken as a whole, yet it seems to me to be immaterial whether such meaning be given to the word " or " or not, for it must be that a fair and reasonable construction of this act, that the moneys were to be paid to Price in his lifetime, and after his death, to his heirs-at-law, and these words " his heirs " are simply words of succession and description of his estate in the money, and they are in this statute as representative of his estate only.   *Holcomb* v. *Lake*, *1 Dutch. 605 ; S. C., 4 Zab. 688 ; Den* v. *English, 2 Harr. 280 ; Den* v. *Allaire, Spenc. 19 ; Engelfried* v. *Woelpart, 1 Yeates 41, 56 ; Winterfield* v. *Stauss, 24 Wis. 394.*

These cases illustrate the construction of the word " or " into " and," to give effect to the fair intention of the legislator.   The many cases cited in *17 Am. & Eng. Encycl. L., tit. " Or," 218–222*, fully illustrate the instances of this construction.

It will be noticed that in the case of *Emerson* v. *Hall, 13 Pet. 409*, which is a case relied on by the defendants, the gift under the statute was, by the express terms of the act of congress, payable to the legal representative of Emerson and Lorraine, respectively, and the title of the act was "An act for the relief of Beverly Chew, and the heirs of William Emerson, deceased, and the heirs of Edward Lorraine, deceased." *6 U. S. Stat. 464.*  The body of the act expressly directs that it shall be paid to their " legal representatives."   An examination of the case shows that the moneys could never, under the law, be paid to Emerson and Lorraine, and that, as to their heirs, it was a gratuity conferred upon them by congress.   The court in that case held that the act evinced a purpose of congress to make a

gift to these heirs; that there was no debt of the government, and that the act was simply a bounty, and that under statute, the money had reached its proper destination when it was withheld from the creditors of Emerson; and this is founded in the fact that the institution by Emerson and Lorraine as officers of the United States navy of the proceedings of condemnation of the slave-trading vessel, and the slaves therein captured, was one purely voluntary on their part, and not at all in the line of their duty towards the government.

The advance of money by Price was a benefit to the government, and necessary to be made for the expenditures of the United States navy.

This fund and the part remaining unpaid, therefore, became a part of the general estate of Price, and thus was liable for his debts, to be distributed according to the laws of the State of New Jersey, the place of his domicil at the time of his death.

Another question has been made as to the jurisdiction of the court of chancery over the parties and the subject-matter involved. The pleas set up the claim of the defendants to this fund in preference to the creditors of Price, and the bill avers and the pleas admit that the defendants are endeavoring to secure payment of this fund to them, and to hinder, delay and finally obstruct the complainants from recovering the same, to be appropriated to the payment of the debts of Price. It must be remembered that the suit is not against the United States nor directly against the fund, but it is a proceeding against the parties, and operating upon them to compel them to an assent to the proper distribution of the fund according to the laws of the domicil of the intestate, and to give effect to the assignment by operation of law to the receiver for this purpose. The decree of the court cannot operate upon the fund to any greater extent than may be permitted by the authorities of the United States treasury, but that furnishes no reason, if the proper parties are before the court, why the court should not decide upon the issues raised by the pleadings. Besides, the previous discussion and decision of the merits of this matter fully answer the insistments of the defendants. The defendants have applied to the officials

of the treasury to have this money paid over to them as the heirs of Price. The comptroller of the treasury has refused this application, and awaits the decision of the court of chancery, which has assumed jurisdiction of the case as between the defendants and the complainants representing the judgment creditor of Price.

So far as this suit is concerned, as soon as the United States treasury passed to his credit, in the accounting, the moneys, the sum thereof became a debt due to him or a legal obligation in his favor, and which he had the legal right at once to reduce to his possession, and which possession he could not deny in a suit against him by the receiver. This money was held by Price without authority to controvert the proposition that, in law, he had assigned it to the receiver. If the money were in private hands instead of in the hands of the government, the receiver could bring suit for it, and neither Price nor his personal representatives could deny that it had been legally assigned to the receiver and had passed to him, and as to the balance of the $23,000 still remaining to his credit in the United States treasury, it is not the right of the defendants, as his personal representatives, to deny that it has been legally assigned to the receiver. The effect of the statute was to render this money to the estate of Price, and the defendants in suit here set up a distinct claim to it, and the court can treat them as if they were in its possession in order to compel them to assign it to the receiver, or to give effect to the assignment to him by operation of law. *Harrison* v. *Maxwell, 15 Vr. 319; Wilkinson* v. *Rutherford, 20 Vr. 245; Williams* v. *Heard, 140 U. S. 529.*

And the heirs-at-law, under their claim to these moneys, are just as much subject to the jurisdiction of this court as Price would have been in his lifetime. The discussion and the principles laid down, and the conclusion to which the learned chancellor arrived in the suit of *Forrest* v. *Price, 7 Dick. Ch. Rep. 16,* in these respects are distinctly approved.

These conclusions would seem to dispose of the case. But it may be well to expressly notice a further insistment by the defendants, and that is that the receiver appointed by the proceed-

ings under the original bill can have no standing to take and receive these moneys; that any assignment of a claim made contrary to the provisions of section 3477 of the revised statutes of the United States, which requires the assignment to be clothed with certain formalities, is void. Whilst this is true as to assignments of claims between the parties made under that statute, the receiver appointed in this suit in equity takes title from Price or the defendants by operation of law, assisted by such actual assignment as may be decreed by the court, and of such assignments the statute to which reference is made is not prohibitive. The receiver is an officer, an assignee, receiving his power from a court of competent authority and jurisdiction, and the title of Price or the defendants is vested in him by operation of law, to take, have and possess the property and things in action of Price to satisfy the judgment and decrees of the court from which he derives his authority. It is entirely within the power of the court of chancery, in order to render effective its decree of appropriation of the fund to the payment of debts, to order the defendants to actually make and execute a formal assignment to fully accomplish the object of the decree.

These classes of assignments to claims against the government of the United States have been upheld and sustained whenever the question has been fairly before the court of claims or in the supreme court of the United States.

Thus, full effect is given as well to assignments ordered by courts of competent jurisdiction, as to those assignments which result by operation of law by reason of the appointment of a receiver for the purposes contemplated by the present suit.

Under the authorities a receiver appointed by a court of competent jurisdiction will be sustained in asserting the same title to choses in action which might, as against the government, be asserted by assignees in bankruptcy under deeds of general assignment.

It may be well, in the light of authority, to consider the effect of section 3477 of the revised statutes of the United States, so long as it is contended under it that the court is without any jurisdiction to compel the defendants to execute an assignment or to give effect to any assignment by operation of law.

The statute is entitled "An act to prevent fraud upon the treasurer of the United States," approved February 26th, 1853 (*10 U. S. Stat. 170*), and is in the following language:

"All transfers and assignments made of any claim upon the United States, or any part or share thereof or interest therein, whether absolute or conditional, and whatever may be the consideration thereto, and all powers of attorney, orders or other authorities for receiving payment of any such claims or any part or share thereof, shall be absolutely null and void unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfers, assignments and powers of attorney must recite the warrant for payment and must be acknowledged by the person making it before an officer having authority to take acknowledgment of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment or warrant of attorney to the person acknowledging the same."

The true meaning and purpose of congress in this enactment was passed upon by Mr. Justice Woods in *Hobbs* v. *McLean, 117 U. S. 576,* who says that the object of the statute was " that the government might not be harassed by multiplying the number of persons with whom it has to deal and might always know with whom it was dealing until the contract was completed and settlement made."

In the case of *United States* v. *Gillis, 95 U. S. 416,* Mr. Justice Strong distinctly recognized that certain claims under this statute were assignable and might be sued in the court of claims in the name of the assignee, without undertaking to determine what claims might be assigned, and says: " That there may be such claims is clearly stated in the act of 1853, and their devolutions of title, by force of law, without any act of parties or voluntary assignments, compelled by law, which may have been in view."

In the case of *Erwin* v. *United States, 97 U. S. 392,* the court said: " The act of congress of February 26th, 1853, to prevent frauds upon the treasury of the United States, which was the subject of consideration in the *Gillis Case,* applies only to cases of voluntary assignments of demands against the government,

and does not embrace cases where there has been a transfer of title by operation of law. The passing of claims of heirs, devisees or assignees in bankruptcy is not within the evil at which the statute aimed, nor does the construction given by this court deny to such parties a standing in the court of claims."

The supreme court of the United States has sustained partial payments made at the treasury to an assignee. *McKnight* v. *United States, 98 U. S. 179.*

It has been held that a general assignment made for the benefit of creditors, including all rights, credits, effects and property of every description, covered what might be due to the assignor under a contract with the government for carrying the mail.

In *Goodman* v. *Niblack, 102 U. S. 556,* Mr. Justice Miller, in view of the language of the opinion in *Spofford* v. *Kirk, 97 U. S. 484,* says : " We held it did not include a transfer by operation of law, or in bankruptcy, and we said it did not include one by will. The obvious reason of this is that there can be no purpose in such cases to harass the government by multiplying the number of persons with whom it has to deal, nor any danger of enlisting improper influences in advocacy of the claim, and that the exigencies of the party who held it justified and required the transfer that was made. In what respect does the voluntary assignment for the benefit of his creditors, which is made by an insolvent debtor of all his effects, which must, if it be honest, include a claim against the government, differ from the assignment which is made in bankruptcy? There can here be no intent to bring improper means to bear in establishing the claim, and it is not perceived how the government can be embarrassed by such an assignment. The claim is not specifically mentioned, and is obviously included only for the just and proper purpose of appropriating the whole of his effects to the payment of all his debts. We cannot believe that such a meritorious act as this comes within the evil which congress sought to suppress by the act of 1853."

Assignments of moneys due from the treasury department to receivers appointed under supplementary proceedings for the benefit of a creditor, have been upheld by the court of claims. I

think it may be said that the cases show that they have been uniformly sustained by that court as well as by the supreme court of the United States. *Redfield, Receiver,* v. *United States,. 27 Ct. of Cl. 393.* In this latter case the plaintiff was a receiver,. appointed by the supreme court of the State of New York, city and county of New York. He also had the additional claim of being the assignee of all demands against the United States on the part of one Mitchell, the assignment being executed by Mitchell for the purpose of enabling the claimant to more effectually perform the duties of his receivership under his appointment by the supreme court of New York. Mr. Justice Weldon, delivering the opinion in the court of claims, says: "It may be that the personal assignment by Mitchell to claimant, it being for the indebtedness of the United States only, would not have the effect to transfer the claim to him, but his appointment as receiver under the order of the court has, in our opinion, that effect. It was held in the case of *Erwin* v. *United States, 97 U. S. 392,* that the act of congress of February 26th, 1853, to prevent frauds upon the treasury of the United States, which was the subject of consideration in the *Gillis Case,* applies only to the voluntary assignment of demands against the government. It does not embrace cases where there has been a transfer of title by operation of law. The passing of claims to heirs and devisees, or assignees in bankruptcy, is not within the evils at which the statute aimed; nor does the construction given by this court deny to such parties a standing in the court of claims."

The conclusion reached from these authorities is that the statute does not prohibit assignments in bankruptcy, nor general assignments for the benefit of creditors, nor assignments decreed by a court of competent jurisdiction, between parties, for the benefit of the creditors of the person or estate of the claimant; nor assignments by operation of law, as now recognized and enforced by the various courts of competent jurisdiction in the several states of the Union. Besides, this interpretation of the statute is entirely consonant and in furtherance of justice. The only case relied upon by defendants is that of

*St. Paul and Duluth Railroad Co.* v. *United States, 112 U. S. 733.* An examination of the case will show that all that was decided in that case was that the voluntary transfer of a claim against the United States for compensation to a railroad company for carrying the mail, made to another company by way of mortgage, does not fall within the exceptions of the statute, such as an assignment by operation of law or a voluntary assignment for the benefit of creditors. The court said in that case, in effect, that the fact that the mortgage was foreclosed by judicial action, did not constitute an assignment by operation of law. This case is no authority to sustain the point that the receiver of the property and things in action of a debtor, for appropriation to the payment of debts, deriving his authority from a court of competent jurisdiction, does not take, by virtue of an assignment by operation of law, a claim against the United States.

The conclusion reached is that the order of the chancellor, overruling the pleas, must be affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, GUMMERE, LIPPINCOTT, LUDLOW, MAGIE, VAN SYCKEL, BROWN, SIMS, TALMAN—10.

*For reversal*—None.